Christina J. Moser (S.B.N. 199027)
cmoser@bakerlaw.com
Michael Brown (S.B.N. 328579)
mbrown@bakerlaw.com
Jeremy Chai (S.B.N. 335250)
jchai@bakerlaw.com
BAKER & HOSTETLER LLP
1900 Avenue of the Stars, Suite 2700
Los Angeles, CA 90067-4301
Telephone: 310.820.8800
Facsimile: 310.820.8859

Lisa N. Collins (Admitted *pro hac vice*)
lncollins@bakerlaw.com
James B. Hatten (Admitted *pro hac vice*)
jhatten@bakerlaw.com
BAKER & HOSTETLER LLP
1170 Peachtree Street, Suite 2400
Atlanta, GA 30309-7676
Telephone: 404.459.0050
Facsimile: 404.459.5734

*Attorneys for*
Defendant and Counterclaimant
DIRECTV, LLC



**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SYNAMEDIA AMERICAS LLC,

Plaintiff,

v.

DIRECTV, LLC,

Defendant.

---

DIRECTV, LLC,

Counterclaimant,

v.

SYNAMEDIA AMERICAS LLC,

Counterdefendant.

Case No.: 2:24-cv-04967-GW-(MAAx)

*Honorable George H. Wu*

**DIRECTV, LLC'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S THIRD AMENDED COMPLAINT, AND COUNTERCLAIMS**

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Defendant DIRECTV, LLC ("DIRECTV" or "Defendant") files this Answer and Affirmative Defenses to Plaintiff Synamedia Americas LLC's ("Synamedia" or "Plaintiff") Third Amended Complaint ("Complaint") and sets forth its Counterclaims against Synamedia. DIRECTV denies all allegations in the Complaint unless expressly and specifically indicated otherwise in the following paragraphs.

## INTRODUCTION

1. DIRECTV admits Synamedia attempts to state claims for misappropriation of intellectual property. DIRECTV admits the Court has subject-matter jurisdiction. DIRECTV denies the remaining allegations of Paragraph 1 of the Complaint.

2. DIRECTV admits Synamedia and its predecessor, NDS Limited, licensed to DIRECTV certain conditional access services and sold to DIRECTV certain hardware for implementing a conditional access system, which DIRECTV used to provide satellite television services only to its paying customers, while blocking unauthorized access. DIRECTV denies Synamedia or its predecessor developed all intellectual property licensed to DIRECTV. DIRECTV developed and/or co-developed the underlying technology for DIRECTV's current conditional access system, including DIRECTV's D1 smart card. DIRECTV designed these smart cards when Synamedia/NDS failed to solve the serious hacking problem plaguing Synamedia's/NDS' previous generations of smart cards. DIRECTV denies the remaining allegations of Paragraph 2 of the Complaint.

3. DIRECTV admits NDS and DIRECTV had a dispute arising from hacks of NDS's smart card technology. DIRECTV admits NDS became DIRECTV's vendor for conditional access systems pursuant to the Security Services Agreement following News Corp.'s acquisition and common control of DIRECTV and NDS in 2003. DIRECTV admits Exhibit A to the Complaint appears to be a true and correct copy of the Security Services Agreement.

DIRECTV admits the parties extended the Security Services Agreement multiple times and that the Security Services Agreement was set to expire on July 31, 2024. DIRECTV denies the Security Services Agreement expired on July 31, 2024. DIRECTV terminated the Security Services Agreement on June 18, 2024, due to Synamedia's Breach of said Agreement. DIRECTV denies the remaining allegations of Paragraph 3 of the Complaint.

4. DIRECTV admits DIRECTV and Synamedia were engaged in negotiations for an extension of the Security Services Agreement. DIRECTV states the fourth amendment to the Umbrella Agreement provided DIRECTV the unilateral "option to renew" the Middleware Development and License Agreement "under the same, pricing, terms and conditions [as the] Umbrella Agreement" and did not tie renewal of the Middleware Development and License Agreement to renewal of the Security Services Agreement or any other agreement. DIRECTV states the Security Services Agreement provides DIRECTV with a perpetual right and license to the intellectual property and know-how relating to DIRECTV's Conditional Access Segment. DIRECTV denies the remaining allegations of Paragraph 4 of the Complaint.

5. DIRECTV admits after Synamedia failed to abide by the terms of the Security Services Agreement and Synamedia failed to negotiate a reasonable extension of the term, DIRECTV withdrew its offer and instead asserted its rights under the Security Services Agreement to Transition. DIRECTV denies the remaining allegations of Paragraph 5 of the Complaint.

6. DIRECTV admits DIRECTV declared a Transition, in writing, on April 29, 2024, but due to time differences between the parties, the parties agreed to treat the Declaration of Transition as having been made on April 30, 2024. DIRECTV admits the Security Services Agreement governs a Transition. DIRECTV admits it has not withdrawn its valid Declaration of Transition despite Synamedia's request that DIRECTV do so. DIRECTV admits that it announced a



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

proposed merger with DISH Network on September 30, 2006, but denies that the timing of that announcement five months after its Declaration of Transition had anything to do with its decision to terminate the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 6 of the Complaint.

7. DIRECTV denies Paragraph 7 of the Complaint.

8. DIRECTV denies any liability to Synamedia, that Synamedia is entitled to any relief, and denies all remaining allegations in Paragraph 8 of the Complaint.

## PARTIES

9. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 9 of the Complaint and therefore denies them.

10. DIRECTV admits it is a California limited liability company having a principal place of business in El Segundo, California.

11. DIRECTV admits and states DIRECTV Operations, LLC is the former name of DIRECTV, LLC, and publicly available California Secretary of State records show the name of DIRECTV Operations, LLC was amended to DIRECTV, LLC effective October 19, 2011. DIRECTV admits it is a multichannel video programming distributor.

## JURISDICTION AND VENUE

12. DIRECTV admits the Court has subject-matter jurisdiction over actions arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.

13. DIRECTV admits the Court has subject-matter jurisdiction over the copyright claim.

14. DIRECTV admits the Court has supplemental jurisdiction over the other claims in the Complaint.

15. DIRECTV admits Paragraph 15 of the Complaint.

16. DIRECTV admits the Court has personal jurisdiction over it. DIRECTV admits Paragraph 16 of the Complaint quotes Section 13.4 of the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 16 of the Complaint.

17. DIRECTV admits venue is proper in the Central District of California. DIRECTV denies the remaining allegations of Paragraph 17 of the Complaint.

## **FACTUAL BACKGROUND**

18. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 18 of the Complaint and therefore denies them.

19. DIRECTV admits footnote 2 of Paragraph 19 of the Complaint quotes the definition of "Conditional Access Services" of the Security Services Agreement. DIRECTV further admits Paragraph 19 describes the general functionality of any conditional access system. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 19 of the Complaint and therefore denies them.

20. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20 of the Complaint and therefore denies them.

21. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 21 of the Complaint and therefore denies them.

22. DIRECTV admits DIRECTV licensed conditional access services from Synamedia and purchased certain hardware for implementing a conditional access system pursuant to the Security Services Agreement. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 22 of the Complaint and therefore denies them.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

23. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 23 of the Complaint and therefore denies them.

24. Pursuant to the Joint Stipulation re Synamedia America LLC's Patent Allegations in its Third Amended Complaint, the Parties have agreed Paragraph 24 should be stricken from the Complaint and have jointly submitted a Proposed Order to the Court to that effect. *See* Dkt. 261. Alternatively, DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 24 of the Complaint and therefore denies them.

25. Pursuant to the Joint Stipulation re Synamedia America LLC's Patent Allegations in its Third Amended Complaint, the Parties have agreed Paragraph 25 should be stricken from the Complaint and have jointly submitted a Proposed Order to the Court to that effect. *See* Dkt. 261. Alternatively, DIRECTV admits Paragraph 25 selectively quotes portions of the '192 Patent. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 25 of the Complaint and therefore denies them.

26. Pursuant to the Joint Stipulation re Synamedia America LLC's Patent Allegations in its Third Amended Complaint, the Parties have agreed Paragraph 26 is stricken from the Complaint and have jointly submitted a Proposed Order to the Court to that effect. *See* Dkt. 261. Alternatively, DIRECTV admits the '192 Patent is directed to preventing cloning of smart cards. DIRECTV denies the '192 Patent is directed to any other aspect of conditional access systems. DIRECTV denies that the paraphrase of claim 4 is accurate. DIRECTV denies the remaining allegations of Paragraph 26.

27. Pursuant to the Joint Stipulation re Synamedia America LLC's Patent Allegations in its Third Amended Complaint, the Parties have agreed Paragraph 27 is stricken from the Complaint and have jointly submitted a Proposed Order to the Court to that effect. *See* Dkt. 261. Alternatively, DIRECTV admits Paragraph 27

purports to selectively quote certain portions from the specification of the ’192 Patent but denies the quotes are exact. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 27 of the Complaint and therefore denies them.

28. Pursuant to the Joint Stipulation re Synamedia America LLC’s Patent Allegations in its Third Amended Complaint, the Parties have agreed Paragraph 28 should be stricken from the Complaint and have jointly submitted a Proposed Order to the Court to that effect. *See* Dkt. 261. Alternatively, DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 28 of the Complaint and therefore denies them.

29. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 29 of the Complaint and therefore denies them.

30. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30 of the Complaint and therefore denies them.

31. DIRECTV admits the allegations of Paragraph 31 of the Complaint.

32. DIRECTV admits NDS and DIRECTV previously had a dispute arising from repeated hacking of NDS’s smart cards. On September 6, 2002, DIRECTV filed a lawsuit against NDS for NDS’s breach of the parties’ Conditional Access License Services Agreement due to these security failures. DIRECTV also sought to transition conditional access services to itself as the Successor Contractor. NDS filed counterclaims related to alleged misuse of its intellectual property. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of Synamedia’s allegation quoting an alleged statement it made at that time and therefore denies the same. DIRECTV denies that its D1 smart card was a knock-off of any other smart card, including any NDS smart card. DIRECTV denies the remaining allegations of Paragraph 32 of the Complaint.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

33. DIRECTV admits DIRECTV and NDS resolved their dispute and entered into the Security Services Agreement following News Corp.'s acquisition and common control of DIRECTV and NDS in 2003. DIRECTV denies the remaining allegations of Paragraph 33 of the Complaint.

34. DIRECTV admits, in 2004, DIRECTV Operations, LLC—the former name of DIRECTV, LLC—and NDS Limited—Synamedia's predecessor—entered into the Security Services Agreement. DIRECTV admits the Statement of Work is Exhibit A to the Security Services Agreement. DIRECTV admits the Effective Date of the Security Services Agreement is March 1, 2004. DIRECTV denies the remaining allegations of Paragraph 34 of the Complaint.

35. DIRECTV admits the Security Services Agreement is marked "NDS AND DIRECTV PROPRIETARY AND CONFIDENTIAL." DIRECTV denies the remaining allegations of Paragraph 35 of the Complaint.

36. DIRECTV admits Paragraph 36 of the Complaint selectively quotes Sections 5.1.4 and 9.1.4 of the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 36 of the Complaint.

37. DIRECTV admits Paragraph 37 of the Complaint selectively quotes Sections 19.2 and 19.3.5 of the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 37 of the Complaint.

38. DIRECTV denies the allegations of Paragraph 38 of the Complaint.

39. DIRECTV admits Section 2.1 of the Security Services Agreement designated "NDS as the sole and exclusive supplier of Conditional Access Services." DIRECTV admits Section 17.1 of the Security Services Agreement originally provided DIRECTV with the right "at its sole discretion, [to] extend the Term for two additional one (1) year periods." However, Amendment No. 4, effective as of July 31, 2020, superseded Section 17.1 of the Security Services Agreement and provided DIRECTV "the option to renew for a four (4) year term

Baker & Hostetler LLP
Attorneys at Law
Los Angeles

or the option to renew for up to two (2) x two (2) year terms." DIRECTV denies the remaining allegations of Paragraph 39 of the Complaint.

40. DIRECTV admits Paragraph 40(a) of the Complaint quotes the definition of "Necessary Specification" and a portion of Section 7.5.4(a) of the Security Services Agreement. DIRECTV admits Paragraph 40(b) of the Complaint quotes Section 18.1 of the Security Services Agreement. DIRECTV admits Paragraph 40(c) of the Complaint quotes the definition of "Transition" and selectively quotes Section 18.2 of the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 40 of the Complaint.

41. DIRECTV admits the Parties negotiated eight amendments to the Security Services Agreement that extended the Term of the Security Services Agreement through July 31, 2024. DIRECTV denies any obligation to migrate to another conditional access system. DIRECTV, at its sole discretion, may Transition to another conditional access provider, such as itself, without any requirement to migrate to another conditional access system. DIRECTV denies the remaining allegations of Paragraph 41 of the Complaint.

42. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 of the Complaint and therefore denies them.

43. DIRECTV admits the allegations of Paragraph 43 of the Complaint.

44. DIRECTV admits it engaged Synamedia in negotiations to extend the Security Services Agreement but denies it waited until the first half of 2024 to do so. DIRECTV attempted in vain to negotiate a renewal with Synamedia since at least June 2022, but Synamedia ignored DIRECTV for at least a year. DIRECTV denies the remaining allegations of Paragraph 44 of the Complaint.

45. DIRECTV admits the Security Services Agreement provides DIRECTV with a perpetual right and license to the intellectual property and know-how relating to DIRECTV's Conditional Access Segment. DIRECTV admits the

parties agreed to extend the Security Service Agreement multiple times. DIRECTV denies the remaining allegations of Paragraph 45 of the Complaint.

46. DIRECTV admits DIRECTV issued a Declaration of Transition, in writing, on April 29, 2024, but, due to time differences between the parties, the parties agreed to treat the Declaration of Transition as having been made on April 30, 2024. DIRECTV denies the remaining allegations of Paragraph 46 of the Complaint.

47. DIRECTV admits DIRECTV coupled DIRECTV's Declaration of Transition with a statement that "DIRECTV's prior proposal for an extension of the [Security Services] Agreement has been revoked" and made numerous requests of Synamedia to adhere to its contractual obligations, including for access to the "Technology Escrow Account" contemplated by the Security Services Agreement. DIRECTV states Synamedia deposited technology relating to DIRECTV's Conditional Access Segment into a technology escrow account as recently as February 28, 2024. DIRECTV denies the remaining allegations of Paragraph 47 of the Complaint.

48. DIRECTV admits Synamedia asked DIRECTV to withdraw the Declaration of Transition. DIRECTV admits DIRECTV initiated and Synamedia and DIRECTV engaged in an informal dispute resolution process pursuant to the Security Services Agreement for certain issues raised by DIRECTV. DIRECTV denies Synamedia engaged in the informal dispute resolution process pursuant to the Security Services Agreement for all claims raised by Synamedia in this Complaint prior to filing this Complaint. DIRECTV admits DIRECTV has refused to withdraw its valid Declaration of Transition. DIRECTV admits on May 1, 2024, DIRECTV issued a "Notice of Material Breach" to Synamedia, and on May 17, 2024, DIRECTV issued a "Notice of Synamedia's Material Breach" to Synamedia. DIRECTV admits DIRECTV requested Synamedia participate in the Transition under the Security Services Agreement and to provide DIRECTV with all

documentation and information specified in the Security Services Agreement relating to technology incorporated into or used in connection with any DIRECTV Conditional Access Segment. DIRECTV denies the remaining allegations of Paragraph 48 of the Complaint.

49. DIRECTV admits in September 2024, DIRECTV and DISH Network announced an intent to merge. DIRECTV admits that the merger was called off in November 2024. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 of the Complaint and therefore denies them.

50. DIRECTV denies the allegations in Paragraph 50 of the Complaint.

51. DIRECTV admits Section 18 of the Security Services Agreement allowed DIRECTV to declare a Transition. DIRECTV denies the remaining allegations of Paragraph 51 of the Complaint.

52. DIRECTV admits Paragraph 52 of the Complaint quotes the definition of "Transition" and selectively quotes Section 18.2.1 of the Security Services Agreement. DIRECTV admits Paragraph 52 of the Complaint quotes Section 6.4.3 of the Statement of Work, which is Exhibit A to the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 52 of the Complaint.

53. DIRECTV admits Paragraph 53 of the Complaint selectively quotes from a portion of Section 6.4.2 of the Statement of Work, which is Exhibit A to the Security Services Agreement. DIRECTV states Section 6.4.2 of the Statement of Work applies only to "the procedure whereby DIRECTV may transition from [Synamedia] to a 'Competing Person of [Synamedia]' at the termination" of the Security Services Agreement, rather than the procedure whereby DIRECTV may transition to itself as provided in Section 18.2 of the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 53 of the Complaint.

54. DIRECTV admits Paragraph 54 of the Complaint selectively quotes from a portion of Section 6.4.2 of the Security Services Agreement. DIRECTV states Section 6.4.2 of the Statement of Work applies only to "the procedure whereby DIRECTV may transition from [Synamedia] to a 'Competing Person of [Synamedia]' at the termination" of the Security Services Agreement, rather than the procedure whereby DIRECTV may transition to itself as provided in Section 18.2 of the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 54 of the Complaint.

55. DIRECTV admits when the Security Services Agreement was executed in 2004, DIRECTV was paying NDS [redacted] of dollars annually in fees. DIRECTV denies the remaining allegations of Paragraph 55 of the Complaint.

56. DIRECTV admits Paragraph 56 of the Complaint selectively quotes from Section 9.1.2 of the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 56 of the Complaint.

57. DIRECTV denies the allegations of Paragraph 57 of the Complaint.

58. DIRECTV admits on April 24, 2024, DIRECTV issued Purchase Order No. 30766490 to Synamedia for [redacted] DIRECTV admits DIRECTV's cover email for Purchase Order No. 30766490 communicated that [redacted] DIRECTV admits as of April 24, 2024, DIRECTV had not then (and still has not) successfully negotiated an extension of the Security Services Agreement beyond July 31, 2024. DIRECTV denies the remaining allegations of Paragraph 58 of the Complaint.

59. DIRECTV denies the allegations of Paragraph 59 of the Complaint.

60. DIRECTV admits Synamedia initially withheld acceptance of Purchase Order No. 30766490. DIRECTV admits Purchase Order No. 30766490 mistakenly initially called for Purchase Order No. 30766490 to be fulfilled in 10

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

days, which mistake was autogenerated by a computer system. DIRECTV denies the remaining allegations of Paragraph 60 of the Complaint.

61. DIRECTV denies Synamedia or its predecessors have been DIRECTV's sole vendor of conditional access services for over 20 years. DIRECTV states, in 2001, DIRECTV designed its Conditional Access Segment, which incorporated its new, unhacked D1 smart card DIRECTV developed in-house. DIRECTV recently learned that Synamedia has subcontracted out some or all of its obligations under the Security Services Agreement to unauthorized foreign affiliates of Synamedia. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 61 of the Complaint and therefore denies them.

62. DIRECTV admits DIRECTV's Conditional Access Segment includes measures to combat piracy, which support DIRECTV's compliance with DIRECTV's various agreements with television broadcast networks and content providers. DIRECTV admits the Security Services Agreement would have expired on July 31, 2024, but DIRECTV terminated the Security Services Agreement on June 18, 2024, because of Synamedia's Breach of the agreement. DIRECTV denies the remaining allegations of Paragraph 62 of the Complaint.

63. DIRECTV admits Paragraph 63 of the Complaint selectively quotes Section 19.3.5 of the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 63 of the Complaint.

64. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 64 of the Complaint and therefore denies them.

65. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 65 of the Complaint and therefore denies them.

66. DIRECTV denies the allegations of Paragraph 66 of the Complaint.

67. DIRECTV admits it hired a former Synamedia architect who worked on DIRECTV's Conditional Access Segment. DIRECTV denies the remaining allegations of Paragraph 67 of the Complaint.

68. DIRECTV denies the allegations of Paragraph 68 of the Complaint.

69. DIRECTV admits the last payment under the Security Services Agreement was due on June 18, 2024, which DIRECTV paid, because DIRECTV terminated the Security Services Agreement for cause on June 18, 2024. Thereafter, on July 5, 2024, DIRECTV made its first Transition License Fee Payment, but Synamedia returned the payment on July 11, 2024. DIRECTV denies the remaining allegations of Paragraph 69 of the Complaint.

70. DIRECTV denies the allegations of Paragraph 70 of the Complaint.

71. Pursuant to the Joint Stipulation re Synamedia America LLC's Patent Allegations in its Third Amended Complaint, the Parties have agreed Paragraph 71 is stricken from the Complaint and have jointly submitted a Proposed Order to the Court to that effect. *See* Dkt. 261. Alternatively, DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 71 of the Complaint and therefore denies them.

72. Pursuant to the Joint Stipulation re Synamedia America LLC's Patent Allegations in its Third Amended Complaint, the Parties have agreed Paragraph 72 is stricken from the Complaint and have jointly submitted a Proposed Order to the Court to that effect. *See* Dkt. 261. Alternatively, DIRECTV denies the allegations of Paragraph 72 of the Complaint.[1]

[1] To the extent footnote 10 to Paragraph 72 of the Complaint was intended to include any allegations, DIRECTV denies them. To the extent Synamedia alleges any conduct by DIRECTV constituted infringement of its patent, Synamedia's allegations are barred by the doctrine of exhaustion and because Synamedia "declines to further plead patent claims" following the Court's prior dismissal of such patent claims within the time allowed to amend, the claims are precluded.

73. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 73 of the Complaint and therefore denies them.

74. DIRECTV denies the allegations of Paragraph 74 of the Complaint.

75. DIRECTV denies the allegations of Paragraph 75 of the Complaint.

76. DIRECTV denies the allegations of Paragraph 76 of the Complaint.

77. DIRECTV denies the allegations of Paragraph 77 of the Complaint.

78. DIRECTV denies the allegations of Paragraph 78 of the Complaint.

79. DIRECTV denies the allegations of Paragraph 79 of the Complaint.

80. DIRECTV denies the allegations of Paragraph 80 of the Complaint.

81. DIRECTV admits NDS and DIRECTV entered into the Middleware Development and License Agreement having an effective date of January 31, 2011. DIRECTV admits the Middleware Development and License Agreement relate to certain set-top-box software. DIRECTV admits that Exhibit B appears to be a true and correct copy of the Middleware Development and License Agreement. DIRECTV denies the remaining allegations of Paragraph 81 of the Complaint.

82. DIRECTV admits Paragraph 82 quotes the definition of Middleware Software in the Middleware Development and License Agreement. DIRECTV admits middleware software facilitates the use of certain features (such as digital video recording) with DIRECTV's system. DIRECTV denies the remaining allegations of Paragraph 82 of the Complaint.

83. DIRECTV admits that in 2016, Cisco and DIRECTV entered into the Umbrella Agreement. DIRECTV admits that AT&T acquired DIRECTV in 2015. DIRECTV admits that Paragraph 83 quotes from a recital in the Umbrella Agreement. DIRECTV admits that Exhibit C to the Complaint appears to be a true and correct copy of the Umbrella Agreement. DIRECTV denies the remaining allegations of Paragraph 83 of the Complaint.

84. DIRECTV admits the allegations in Paragraph 84 of the Complaint.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

85. DIRECTV admits that Exhibit D appears to be a true and correct copy of the fourth amendment to the Umbrella Agreement. DIRECTV admits the remaining allegations in Paragraph 85.

86. DIRECTV denies the allegations in Paragraph 86 of the Complaint.

87. DIRECTV admits the fourth amendment to the Umbrella Agreement amended Section 4.1 of Exhibit E to the Middleware Development and License Agreement. DIRECTV admits that Paragraph 87 quotes the title of Section 4.1 of Exhibit E to the Middleware Development and License Agreement. DIRECTV admits Paragraph 87 selectively quotes a portion of the amendment to Section 4.1 of Exhibit E to the Middleware Development and License Agreement, stating "[t]his End to End Maintenance and Support for Middleware and iTV Headend and AMS System shall be invoiced and paid as part of the Fixed Fee as detailed in Section 8.3.1 of the SSA and is subject to the terms and conditions of Appendix I." DIRECTV further states the "terms and conditions of Appendix I" provide "[t]he maintenance term will be the same as the SSA term" (App'x I, Section 5.1) and "[t]his Maintenance and Support Agreement will be terminated in the event the SSA is terminated" (*id.*, Section 5.2). DIRECTV denies the remaining allegations in Paragraph 87 of the Complaint.

88. DIRECTV admits at the time the fourth amendment to the Umbrella Agreement was executed, the Security Services Agreement, the Middleware Development and License Agreement, and the DRM Agreement had terms which would extend through July 31, 2024, unless otherwise terminated. DIRECTV denies the remaining allegations in Paragraph 88 of the Complaint.

89. DIRECTV admits Paragraph 89 quotes from a "Renewal Period" provision on page 9 of the Umbrella Agreement. DIRECTV admits Paragraph 89 quotes from a definition of "Expiration Date" on page 2 of the Umbrella Agreement. DIRECTV denies the remaining allegations in Paragraph 89 of the Complaint.

90. DIRECTV denies the allegations in Paragraph 90 of the Complaint.

91. DIRECTV denies the allegations in Paragraph 91 of the Complaint.

92. DIRECTV denies the allegations in Paragraph 92 of the Complaint.

93. DIRECTV admits Paragraph 93 includes quoted phrases appearing in Section 6.3(a)(i) of the Middleware Development and License Agreement. DIRECTV denies the remaining allegations in Paragraph 93 of the Complaint.

94. DIRECTV denies the allegations in Paragraph 94 of the Complaint.

95. DIRECTV denies the allegations in Paragraph 95 of the Complaint.

96. DIRECTV denies the allegations in Paragraph 96 of the Complaint.

97. DIRECTV admits Paragraph 97 selectively quotes from Exhibit B to the Middleware Development and License Agreement. To the extent Paragraph 97 of the Complaint was intended to include any allegations, DIRECTV denies them.

98. DIRECTV denies the allegations in Paragraph 98 of the Complaint.

99. DIRECTV denies the allegations in Paragraph 99 of the Complaint.

100. DIRECTV denies the allegations in Paragraph 100 of the Complaint.

101. DIRECTV denies the allegations in Paragraph 101 of the Complaint.

102. DIRECTV admits that DIRECTV raised notice of a dispute under the dispute-resolution process in Section 12 of the Middleware Development and License Agreement on July 11, 2024. DIRECTV admits the dispute has not been resolved. DIRECTV is without knowledge of information sufficient to admit or deny the remaining allegations in Paragraph 102 of the Complaint and therefore denies them.

## FIRST CLAIM FOR RELIEF

103. DIRECTV incorporates by reference the foregoing paragraphs.

104. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 104 of the Complaint and therefore denies them.

105. DIRECTV denies the allegations of Paragraph 105 of the Complaint.

106. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 106 of the Complaint and therefore denies them.

107. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 107 of the Complaint and therefore denies them.

108. DIRECTV denies the allegations of Paragraph 108 of the Complaint.

109. DIRECTV admits Paragraph 109(a) of the Complaint quotes Section 19.3.1 of the Security Services Agreement. DIRECTV admits Paragraph 109(b) of the Complaint quotes Section 19.6 of the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 109 of the Complaint.

110. DIRECTV denies the allegations of Paragraph 110 of the Complaint.

111. DIRECTV denies the allegations of Paragraph 111 of the Complaint.

112. DIRECTV denies the allegations of Paragraph 112 of the Complaint.

113. DIRECTV denies the allegations of Paragraph 113 of the Complaint.

114. DIRECTV admits Synamedia purports to seek injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A). DIRECTV denies Synamedia is entitled to injunctive relief. DIRECTV denies the remaining allegations of Paragraph 114 of the Complaint.

115. DIRECTV admits Synamedia purports to seek an award of actual damages under 18 U.S.C. § 1836(b)(3)(B). DIRECTV denies Synamedia is entitled to an award of actual damages. DIRECTV denies the remaining allegations of Paragraph 115 of the Complaint.

116. DIRECTV admits Synamedia purports to seek exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D). DIRECTV denies Synamedia is entitled to exemplary damages or attorneys' fees. DIRECTV denies the remaining allegations of Paragraph 116 of the Complaint.

## SECOND CLAIM FOR RELIEF

117. DIRECTV incorporates by reference the foregoing paragraphs.

118. DIRECTV denies DIRECTV has misappropriated any Synamedia trade secrets. DIRECTV incorporates by reference its responses to Paragraphs 103 through 116 of the Complaint. DIRECTV is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 118 of the Complaint and therefore denies them.

119. DIRECTV denies the allegations of Paragraph 119 of the Complaint.

120. DIRECTV denies the allegations of Paragraph 120 of the Complaint.

121. DIRECTV denies the allegations of Paragraph 121 of the Complaint.

122. DIRECTV denies the allegations of Paragraph 122 of the Complaint.

## THIRD CLAIM FOR RELIEF

123. DIRECTV incorporates by reference the foregoing paragraphs.

124. DIRECTV admits the allegations of Paragraph 124 of the Complaint.

125. DIRECTV admits the allegations of Paragraph 125 of the Complaint.

126. DIRECTV denies the allegations of Paragraph 126 of the Complaint.

127. DIRECTV admits DIRECTV's Notice of Material Breach sent on May 1, 2024, asserted that Synamedia's withheld acceptance of Purchase Order No. 30766490 constituted a Breach of the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 127 of the Complaint.

128. DIRECTV admits DIRECTV asserted that, even absent a Breach of the Security Services Agreement, the Security Services Agreement provides DIRECTV with a perpetual right and license to the intellectual property and know-how relating to DIRECTV's Conditional Access Segment. DIRECTV denies the remaining allegations of Paragraph 128 of the Complaint.

129. DIRECTV admits Synamedia purports to seek a judgment declaring the enumerated findings of Paragraphs 129(a)-(i) of the Complaint. DIRECTV

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

denies Synamedia is entitled to any such judgment or declarations. DIRECTV denies the remaining allegations of Paragraph 129 of the Complaint.

**FOURTH CLAIM FOR RELIEF**

130. DIRECTV incorporates by reference the foregoing paragraphs.

131. DIRECTV admits the allegations of Paragraph 131 of the Complaint.

132. DIRECTV denies the allegations of Paragraph 132 of the Complaint.

133. DIRECTV admits DIRECTV has asserted that the Security Services Agreement provides DIRECTV with a perpetual right license to the intellectual property and know-how relating to DIRECTV's Conditional Access Segment. DIRECTV admits DIRECTV issued Purchase Order No. 30766490. DIRECTV denies the remaining allegations of Paragraph 133 of the Complaint.

134. DIRECTV denies the allegations of Paragraph 134 of the Complaint.

135. DIRECTV denies the allegations of Paragraph 135 of the Complaint.

**FIFTH CLAIM FOR RELIEF**

136. DIRECTV incorporates by reference the foregoing paragraphs.

137. DIRECTV admits the allegations of Paragraph 137 of the Complaint.

138. DIRECTV denies the allegations of Paragraph 138 of the Complaint.

139. DIRECTV admits each party to the Agreement retained ownership of their respective Intellectual Property Rights, except as otherwise licensed. DIRECTV admits that paragraph 139 selectively quotes from portions of Sections 9.1.4 and 5.1.4 of the Security Services Agreement. DIRECTV denies the remaining allegations of Paragraph 139 of the Complaint.

140. DIRECTV admits Paragraph 140 quotes from Sections 19.2 and a portion of 19.3.5 of the Security Services Agreement. To the extent Paragraph 140 of the Complaint was intended to include additional allegations, DIRECTV denies them.

141. DIRECTV admits Paragraph 141 quotes from Section 9.1.1 of the Agreement. DIRECTV denies the remaining allegations of Paragraph 141 of the Complaint.

142. DIRECTV denies the allegations of Paragraph 142 of the Complaint.

143. DIRECTV denies the allegations of Paragraph 143 of the Complaint.

**SIXTH CLAIM FOR RELIEF**

144. DIRECTV incorporates by reference the foregoing paragraphs.

145. DIRECTV admits the allegations of Paragraph 145 of the Complaint.

146. DIRECTV denies the allegations of Paragraph 146 of the Complaint.

147. DIRECTV denies the allegations of Paragraph 147 of the Complaint.

148. DIRECTV denies the allegations of Paragraph 148 of the Complaint.

149. DIRECTV denies the allegations of Paragraph 149 of the Complaint.

150. DIRECTV denies the allegations of Paragraph 150 of the Complaint.

151. DIRECTV denies the allegations of Paragraph 151 of the Complaint.

152. DIRECTV denies the allegations of Paragraph 152 of the Complaint.

**SEVENTH CLAIM FOR RELIEF**

153. DIRECTV incorporates by reference the foregoing paragraphs.

154. DIRECTV states NDS Limited and DIRECTV are Parties to the Middleware Agreement. DIRECTV states Cisco Systems, Inc. and DIRECTV are Parties to the Umbrella Agreement. DIRECTV admits Synamedia and DIRECTV are Parties to Amendment No. 4 to the Umbrella Agreement. DIRECTV admits that Amendment No. 4 to the Umbrella Agreement amended the Middleware Agreement and other agreements. To the extent Paragraph 154 alleges Synamedia is the successor-in-interest to NDS Limited with respect to the Middleware Agreement or Cisco Systems, Inc. with respect to the Umbrella Agreement, DIRECTV is without knowledge or information sufficient to form a belief as to the truth of such allegations and therefore denies them. To the extent Paragraph 154 of

the Complaint was intended to include additional allegations, DIRECTV denies them.

155. DIRECTV admits the allegations of Paragraph 159 of the Complaint.

156. DIRECTV admits DIRECTV and Cisco Systems, Inc. entered the Umbrella Agreement in 2016. DIRECTV admits the Umbrella Agreement amended several agreements to extend them and set the expiration dates to the same date. Under the Umbrella Agreement, the agreements remained separate. DIRECTV admits the Umbrella Agreement did not add a renewal or extension provision. To the extent Paragraph 156 of the Complaint was intended to include additional allegations, DIRECTV denies them.

157. DIRECTV denies the Parties agreed to a bundled fee arrangement in Amendment No. 4 to the Umbrella Agreement. DIRECTV admits Paragraph 157 selectively quotes from page 3 of Amendment No. 4 to the Umbrella Agreement. DIRECTV denies the remaining allegations of Paragraph 157 of the Complaint, noting specifically that the "CAM Security Services Support Fixed Fee" replaced a section in the Security Services Agreement, the Security Services Agreement is no longer in force, DIRECTV exercised its renewal option with respect to the Middleware Agreement, and Subsection 2.1 of the Middleware Agreement, as amended by the 2016 Umbrella Agreement, establishes the royalties due to Synamedia under the Middleware Agreement.

158. DIRECTV admits Paragraph 158 quotes from page 7 of Amendment No. 4 to the Umbrella Agreement. To the extent Paragraph 158 of the Complaint was intended to include additional allegations, DIRECTV denies them.

159. DIRECTV admits pursuant to Amendment No. 4 to the Umbrella Agreement, the Security Services Agreement, Middleware Development and License Agreement, and Videoguard Connect Supply and License Agreement (DRM) each were set to expire on July 31, 2024. DIRECTV denies the Security Services Agreement expired. DIRECTV terminated the Security Services

Agreement on June 18, 2024, due to Synamedia's Breach of the agreement. DIRECTV denies the Middleware Agreement expired. DIRECTV renewed the Middleware Agreement by exercising its unilateral option to review prior to the expiration date and pursuant to the terms of the agreement. DIRECTV denies the remaining allegations of Paragraph 159 of the Complaint.

160. DIRECTV denies the allegations of Paragraph 160 of the Complaint.

161. DIRECTV denies the allegations of Paragraph 161 of the Complaint.

162. DIRECTV denies the allegations of Paragraph 162 of the Complaint.

163. DIRECTV admits Synamedia purports to seek a judgment declaring the enumerated findings of Paragraphs 163(a)-(f) of the Complaint. DIRECTV denies Synamedia is entitled to any such judgment or declarations. DIRECTV denies the remaining allegations of Paragraph 163 of the Complaint.

## EIGHTH CLAIM FOR RELIEF

164. DIRECTV incorporates by reference the foregoing paragraphs.

165. DIRECTV is without knowledge and information sufficient to admit or deny the allegations in Paragraph 165 of the Complaint and therefore denies them.

166. DIRECTV denies the allegations of Paragraph 166 of the Complaint.

167. DIRECTV denies the allegations of Paragraph 167 of the Complaint.

168. DIRECTV denies the allegations of Paragraph 168 of the Complaint.

169. DIRECTV denies the allegations of Paragraph 169 of the Complaint.

170. DIRECTV denies the allegations of Paragraph 170 of the Complaint.

171. DIRECTV denies the allegations of Paragraph 171 of the Complaint.

172. DIRECTV denies the allegations of Paragraph 172 of the Complaint.

## PRAYER FOR RELIEF

DIRECTV denies Synamedia is entitled to any of the relief Synamedia requests in its prayer for relief or any relief whatsoever, and requests the Court award DIRECTV its attorneys' fees and/or costs pursuant to 18 U.S.C. §

1836(b)(3)(D), Cal. Civ. Code § 3426.4, 35 U.S.C. § 285, and/or Section 13.4 of the Security Services Agreement.

**AFFIRMATIVE AND OTHER DEFENSES**

Subject to the foregoing, DIRECTV alleges and asserts the following defenses in response to Synamedia's Complaint, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law and without reducing or removing Synamedia's burden of proof on its claims against DIRECTV, regardless of how such defenses are denominated herein. In addition to the defenses described below, DIRECTV specifically reserves all rights to allege additional defenses that become known to it through the course of discovery or otherwise.

**FIRST DEFENSE**

Synamedia's claims for relief are barred, in whole or in part, by Synamedia's failure to sufficiently allege a factual and/or legal basis for damages. Synamedia has failed to offer any basis for seeking damages "including, but not limited to actual damages, lost profits," "exemplary damages," and "attorneys' fees."

**SECOND DEFENSE**

Synamedia's claims for relief are barred, in whole or in part, under principles of equity, including estoppel or the doctrine of unclean hands. For example, Synamedia committed a material Breach of the Security Services Agreement and repeatedly rejected DIRECTV's continued good faith attempts to negotiate reasonable terms for an extension of the Security Services Agreement.

**THIRD DEFENSE**

Synamedia's claims for relief are barred, in whole or in part, by the doctrines of waiver and/or acquiescence and/or DIRECTV's alleged actions were justified. For example, the Security Services Agreement provides DIRECTV with a perpetual right and license to the intellectual property and know-how relating to

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

DIRECTV's Conditional Access Segment, and, as such, DIRECTV has a valid right to use Synamedia's alleged intellectual property and know-how.

**FOURTH DEFENSE**

Synamedia's claims for relief are subject to the doctrines of setoff and/or recoupment. Synamedia's claims for relief, if valid, must be offset against the damages DIRECTV is entitled to recover from Synamedia. Synamedia's alleged injuries are also a direct and proximate result of its own acts, conduct, omissions, and/or failure to comply —including its material Breach of—the Security Services Agreement.

**FIFTH DEFENSE**

Synamedia's claims for relief are barred, in whole or in part, by Synamedia's failure to mitigate its damages. Synamedia repeatedly rejected DIRECTV's continued good faith attempts to negotiate reasonable terms for extension of the Security Services Agreement.

**SIXTH DEFENSE**

Synamedia's claims for relief are subject to and/or barred, in whole or in part, by the terms of the Security Services Agreement, the Middleware Development and License Agreement, and the Umbrella Agreement and their respective amendments.

**SEVENTH DEFENSE**

Synamedia is not entitled to injunctive relief because Synamedia is not likely to succeed on the merits of its claims and/or because Synamedia has an adequate remedy at law.

**EIGHTH DEFENSE**

Synamedia's claims are not ripe because Synamedia has failed to comply with conditions precedent set forth in the Security Services Agreement.

**NINTH DEFENSE**

At least some of Synamedia's claims are subject to the Security Services Agreement's mandatory arbitration clause.

**TENTH DEFENSE**

Synamedia lacks standing to assert claims for copyright infringement or has failed to join a necessary plaintiff in this action.

**ELEVENTH DEFENSE**

The claim for copyright infringement is barred in whole or in part on the grounds of fair use.

**TWELTH DEFENSE**

DIRECTV is licensed under at least Sections 9.1.1, 9.1.2, 13.6, and 18.2.1 of the Security Services Agreement to use any of Synamedia's alleged trade secrets or copyrights relating to DIRECTV's Conditional Access Segment as well as the middleware operating on its set-top boxes and satellite receivers.

**THIRTEENTH DEFENSE**

Synamedia has failed to articulate with specificity sufficient to place DIRECTV on notice of what constitutes Synamedia's alleged copyright and has thus failed to state a claim of infringement.

**FOURNTEENTH DEFENSE**

Synamedia's claims of copyright infringement are barred by the first-sale doctrine.

**FIFTEENTH DEFENSE**

Synamedia's ability to obtain injunctive relief is barred or limited by Section 13.5 of the Security Services Agreement, which provides that injunctive relief "shall not preclude or impair to any material degree the provision of the DIRECTV Service by DIRECTV."

**SIXTEENTH DEFENSE**

Synamedia is not entitled to injunctive relief because Synamedia, as the party seeking injunctive relief, failed to submit the matter for resolution by the CAS Liaison Team Resolution Process before, or contemporaneously with, this action as required by Section 13.2 of the Security Services Agreement.

**SEVENTEENTH DEFENSE**

Synamedia's claims for relief based on DIRECTV's alleged continued use of intellectual property relating to DIRECTV's Conditional Access Segment as well as the middleware operating on its set-top boxes and satellite receivers are barred by Section 14(b) of the Middleware Development and License Agreement.

**EIGHTEENTH DEFENSE**

Synamedia's claims for relief based on DIRECTV's alleged continued use of intellectual property relating to DIRECTV's Conditional Access Segment as well as the middleware operating on its set-top boxes and satellite receivers, are preempted by applicable law and such other claims.

## COUNTERCLAIMS

DIRECTV, for its counterclaims against Synamedia, hereby alleges as follows:

## NATURE OF ACTION

1. This is an action for injunctive relief, specific performance of the Security Services Agreement between the parties, tortious interference, and other relief, including for judicial declarations pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that, under the Security Services Agreement and Middleware Development and License Agreement between the parties: (1) there is not, nor was there ever, a waiver of DIRECTV's rights to declare a Transition; (2) DIRECTV validly declared a Transition; (3) Synamedia has breached the Security Services Agreement; (4) DIRECTV has a perpetual right and license to Synamedia's Intellectual Property Rights after the Term of the Security Services Agreement; (5) DIRECTV has certain license and use rights to the Middleware Software and Deliverables in perpetuity as specified in Section 6.3 of the Middleware Development and License Agreement; (6) DIRECTV validly and timely exercised its exclusive option to renew the Middleware Development and License Agreement provided in the Fourth Amendment to the Umbrella Agreement; and (7) Synamedia is in breach of the Middleware Development and License Agreement by failing to perform its obligations during the Renewal Period.

2. Synamedia's words and inaction have created an urgent situation for DIRECTV, whereby DIRECTV may lose access to the Conditional Access Segment technology it developed, to which it has a perpetual right and license, and which has ensured DIRECTV's ability to distribute video content to its subscribers throughout the United States and collect revenue from paying customers while blocking pirates.

3. DIRECTV's Conditional Access Segment has been ingrained in DIRECTV's business for decades and was created a decade prior to the Security

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Services Agreement. DIRECTV's Conditional Access Segment is critical for its continued ability to generate revenue and provide television services for its customers. DIRECTV has current and ongoing rights to the technology, and Synamedia's weaponization of the technology by virtue of its physical custody and control over the technology and documents DIRECTV needs to continue providing its Conditional Access Segment has created a substantial risk of concrete, immediate harm to DIRECTV's business.

4. This is also an action arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq., for: (1) a judicial declaration that DIRECTV has not violated the Defend Trade Secrets Act and (2) damages, exemplary damages, attorneys' fees, costs, and injunctive relief for Synamedia's unauthorized disclosure of DIRECTV's proprietary and confidential information resulting in misappropriation of DIRECTV's trade secrets.

5. DIRECTV requests specific performance requiring Synamedia to participate in the Transition under the Security Services Agreement and to provide DIRECTV with all Licensed Technology and NDS Documentation and other documentation and information specified in Section 18.2.5 of the Security Services Agreement relating to technology incorporated into or used in connection with any DIRECTV Conditional Access Segment.

6. DIRECTV further seeks an award of damages for Synamedia's breach of the Security Services Agreement, DIRECTV's overpayment of fees for Synamedia continuing to serialize chips for DIRECTV satellite receivers pending resolution of this action, and Synamedia's misappropriation of DIRECTV's trade secrets as well as DIRECTV's reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3)(D) and Section 13.4 of the Security Services Agreement, as appropriate.

## PARTIES

7. DIRECTV, LLC, formerly known as DIRECTV Operations, LLC, is a California limited liability company having a principal place of business at 2260 E. Imperial Hwy., El Segundo, California 90245.

8. Synamedia is a Delaware limited liability company that, on information and belief, has its headquarters in Lawrenceville, Georgia.

## JURISDICTION AND VENUE

9. On information and belief, this Court has diversity jurisdiction under 28 U.S.C. § 1332, DIRECTV and Synamedia are citizens of different states, where no state of which DIRECTV is a citizen is a state of which Synamedia is a citizen, and the amount in controversy exceeds $75,000.

10. Under 28 U.S.C. § 1331, the Court has subject matter jurisdiction as an action arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. The Court also has supplemental jurisdiction over all claims other than those arising under the Defend Trade Secrets Act under 28 U.S.C. § 1367, as they form part of the same case or controversy.

11. The Court has personal jurisdiction because Synamedia had during the relevant times a permanent location in Costa Mesa, California, and, on information and belief, a substantial part of the events or omissions underlying the claims pleaded herein occurred in California. Synamedia has further consented to the Court's personal jurisdiction, as it agreed in Section 21.1 of the Security Services Agreement that "it is and shall remain subject to the *in personam*, *in rem*, and subject matter jurisdiction of and that venue is proper in the state and federal courts in the State of California."

12. Venue is proper under 28 U.S.C. § 1394(b) because this district is one in which a substantial part of the events or omissions giving rise to the claim occurred. Moreover, the parties agreed in Section 21.1 of the Security Services

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Agreement that "venue is proper in the state and federal courts in the State of California."

## FACTUAL BACKGROUND

### Synamedia Began as a News Corp. Affiliate and Became a News Corp. Subsidiary

13. In 1988, a company called News Datacom was founded as a service provider of video streaming platforms. The founders had developed a smart card for protecting electronic content.

14. In 1992, News Corp. acquired News Datacom and renamed it News Digital Systems ("NDS"). NDS grew its customer base, providing smart-card-based systems for authorizing access to electronic content. These systems became known as conditional access systems.

15. News Corp. owned NDS until 2012, when Cisco acquired NDS and NDS thereby became part of Cisco's Service Provider Video Software Solutions business unit.

16. Permira, a private-equity investment firm, acquired Cisco's Service Provider Video Software Solutions business unit in 2018 and launched it as a new company – Synamedia. Representatives of Permira continue to serve on Synamedia's Board of Directors.

### Conditional Access Systems Provide Controlled Access to Electronic Content

17. DIRECTV, a satellite television provider, provides paid programming to subscribers of its television service. Satellite television utilizes compressed radio signals carrying audiovisual content, such as TV shows, movies, and sporting events, beamed from satellites in orbit above Earth.

18. A satellite television customer installs a dish, which receives the satellite signal and transmits it to a receiver (such as a set-top box). The receiver processes and decrypts the signal and displays picture and sound on the customer's television.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

19. To ensure only paying customers can access the programming, content distributors—such as DIRECTV—incorporate a conditional access system. In a conditional access system, the broadcast signal is encrypted, rendering it unusable unless and until the signal is decrypted.

20. DIRECTV's conditional access system is referred to as its Conditional Access Segment. DIRECTV's Conditional Access Segment incorporates smart cards in its customers' receivers to decrypt DIRECTV's encrypted broadcast signals and selectively allow access to its broadcast content to its paying customers.

21. The Conditional Access Segment enables DIRECTV to comply with DIRECTV's various agreements with content providers, which drives revenue for DIRECTV.

**DIRECTV and Synamedia Have a 30-Year Business Relationship**

22. The relationship between DIRECTV and Synamedia dates back 30 years. In the 1990s, DIRECTV commissioned Synamedia's predecessor, NDS, to help build (and later service and maintain) DIRECTV's Conditional Access Segment. In particular, on February 2, 1992, DIRECTV and NDS entered into a Conditional Access Security Services Agreement ( "CASSA"), which preceded the Security Services Agreement. A copy of the CASSA is attached hereto as Exhibit A. DIRECTV paid NDS a "Security Services Fee" under the CASSA for "the design, testing, manufacture and installation of the CAS," with DIRECTV's assistance and at its direction (including the use of DIRECTV's facilities and personnel), to protect DIRECTV's satellite television services from third-party hackers. Under the terms of the CASSA, NDS was responsible for "the design, testing, manufacture and installation of the CAS" and provision of "the conditional access module ('CAM') distribution services and the conditional access security services." The CASSA and, later, the Security Services Agreement, were put into place to allow Synamedia to continue to service DIRECTV's Conditional Access

Segment by developing upgrades to the system, ensuring it kept pace with technology and protecting it from ever-evolving attempts by hackers to pirate DIRECTV's satellite signals. The CASSA, like the Security Services Agreement, allowed DIRECTV's continued use of the Conditional Access Segment following termination thereof. For example, Section 13.2(C) of the CASSA describes certain "Transition Obligations" of NDS, including to "in good faith and in a prompt and timely fashion" provide "the CAS Technology" and sufficient information" "regarding CAM technology to enable [a competing person] to promptly develop, and program CAM units capable of properly interacting with the CAMC").

23. NDS provided DIRECTV with VideoGuard, a smart-card-based security and content encryption system.

24. The VideoGuard conditional access system was installed at DIRECTV head ends (the DIRECTV locations where broadcast signals are transmitted to satellites for rebroadcast to Earth), and smart cards were installed in set-top boxes provided to DIRECTV customers. VideoGuard was intended to allow DIRECTV to control what content customers could receive and protected against unauthorized access and piracy.

25. In the 1990s, there were repeated, significant hacks of the VideoGuard technology. NDS had provided DIRECTV with a smart card known as the P1 in 1994. It was quickly hacked. NDS then developed, at DIRECTV's expense, and sold DIRECTV a new smart card known as the P2. When DIRECTV distributed the P2 cards to millions of its subscribers to replace the P1 cards, it too was quickly hacked. DIRECTV again paid millions of dollars for development of yet another upgraded smart card, the P3, and then paid millions of dollars to distribute the new P3 cards to millions of its subscribers to replace the P2 cards. Yet again, the P3 card was hacked. Every smart card version that NDS had provided to DIRECTV, the P1, P2 and P3 smart cards, were hacked.

26. DIRECTV subsidized the cost of set-top boxes. Pirates purchased the subsidized set-top boxes at retail stores, removed the NDS smart cards, and then hacked them so they could receive all DIRECTV programming without requiring a subscription. The pirates then sold the hacked NDS smart cards to DIRECTV customers who inserted the hacked cards into their DIRECTV set-top boxes and then canceled their subscriptions. Several million potential subscribers purchased pirated NDS smart cards and obtained unauthorized access to DIRECTV's programming.

27. The hacks of the P1, P2, and P3 smart cards cost DIRECTV hundreds of millions, if not billions, of dollars.

28. DIRECTV suspected NDS, which reportedly was working closely with hackers and had been accused of enabling the distribution of hacked versions of competitor's smart cards, enabled the hack to allow the public to circumvent its smart cards' security features and create fraudulent demand for replacement smart cards with upgraded security features. The relationship between DIRECTV and NDS grew contentious.

**DIRECTV's History in Developing Conditional Access Components**

29. In 1999 or 2000, in light of the dispute between DIRECTV and NDS arising from the repeated hacking of NDS's technology, NDS ceased providing DIRECTV with conditional access technology. DIRECTV began developing its own conditional access system.

30. In 2001, DIRECTV designed components of its own conditional access system for use in combination with then-existing portions of the prior conditional access system, including a new smart card DIRECTV developed in-house. DIRECTV referred to its smart card as a conditional access module, and this conditional access system including portions of the prior conditional access system and the other portions developed by DIRECTV became DIRECTV's Conditional Access Segment.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

31. The conditional access module became known as DIRECTV's "D1" smart card. DIRECTV deployed the D1 smart card to its customer base, replacing the hacked NDS smart cards. DIRECTV's D1 smart card, which has never been hacked, ended DIRECTV's smart-card piracy problem—a ten-figure problem that NDS was unable to solve.

32. DIRECTV successfully continued its in-house conditional access system development efforts until 2004, committing hundreds of millions of dollars to the development and maintenance of its in-house conditional access system.

**DIRECTV and NDS Previously Litigated Issues Regarding the Scope of License Rights and Intellectual Property**

33. In the midst of the repeated security failures of NDS's smart cards in the late 1990s and early 2000s, DIRECTV exercised its rights under a then-in-force technology license agreement to transition away from NDS and take over the provision and maintenance of its Conditional Access Segment. Specifically, DIRECTV exercised rights to become a "Successor Contractor," which triggered a transition period during which DIRECTV received significantly expanded rights to NDS's intellectual property to allow DIRECTV to develop a new generation smart card. DIRECTV proceeded to develop its D1 smart card, which, unlike the smart cards then available from NDS, was never hacked.

34. NDS, facing a significant loss of revenue as well as its toehold in the U.S. market if DIRECTV were to transition to itself as the Successor Contractor, sought to force DIRECTV to remain an NDS customer through the litigation.

35. NDS lodged twenty counterclaims against DIRECTV, including claims that DIRECTV breached the license agreement and misused or otherwise misappropriated NDS's intellectual property.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**News Corp. Acquires DIRECTV's Parent Company**

36. DIRECTV and NDS remained engaged in litigation concerning DIRECTV's more advanced D1 smart card and the hacked NDS smart cards between September 6, 2002 and August 5, 2003.

37. The parties stayed the litigation on August 5, 2003, and, later in 2003, News Corp. acquired control of Hughes Electronics Corporation, which, at the time, controlled DIRECTV. News Corp. thus controlled both NDS and DIRECTV with its acquisition of Hughes Electronics Corporation.

38. Following News Corp.'s acquisition of control of Hughes Electronics Corporation, in 2004, News Corp. forced DIRECTV to transfer its intellectual property rights for its conditional access module designs—the unhackable D1 smart card and later iterations— and other technologies to NDS, along with most of the DIRECTV employees working on the technology, as evidenced by Section 9.3 of the Security Services Agreement (titled "Delivery of DIRECTV Technology").[2] At this time, with the execution of the Security Services Agreement, NDS licensed DIRECTV's own technology back to DIRECTV, and NDS again became DIRECTV's conditional access system vendor.

39. Upon settlement of the claims between the parties, the parties noticed dismissal of the case on December 31, 2003.

40. Due to these unique circumstances and consistent with the Parties' prior relationship, including the millions of dollars DIRECTV had already paid Synamedia to develop and maintain aspects of DIRECTV's conditional access system, and the significant value DIRECTV brought to the Parties' forced settlement in 2003, the Security Services Agreement contains key provisions that

[2] The Security Services Agreement defines "DIRECTV Technology" as "all technology, software, trade secrets, know-how and Proprietary Information, and related documentation (including the DIRECTV requirements and the DIRECTV materials identified from time to time in Exhibit A and in Section 9.3) owned or controlled by, or licensed to DIRECTV relating to the Conditional Access Segment or otherwise needed by NDS to fulfill its obligations or exercise its rights under this Agreement and relating to the DIRECTV Service."



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

allow DIRECTV to peacefully transition away from NDS and continue using all intellectual property associated with its conditional access systems after its relationship with NDS ended.

**The Security Services Agreement**

41. While under the common control of News Corp., DIRECTV and NDS Limited (a predecessor entity to Synamedia) entered into the Security Services Agreement, effective as of March 1, 2004. The Security Services Agreement is attached to Synamedia's Third Amended Complaint as Exhibit A. *See* Dkt. 255-1.

42. The Security Services Agreement governs Synamedia's provision of goods and services as the service provider for the conditional access segment of DIRECTV's service, as well as the parties' rights and obligations with respect to the provision of conditional access technology to DIRECTV, both during and after the term of the Security Services Agreement.

43. The "Conditional Access Services" Synamedia was obligated to provide were "end-to-end conditional access system development, support, maintenance and enhancement," "including without limitation, engineering Change Requests, Conditional Access Module (CAM) development, derived Verifier and head-end development, integrated receiver decoder (IRD) support, technical support, and other services" and technical support "intended to help DIRECTV test, operate, and maintain the Conditional Access Segment," including "software installation, including upgrades of the Conditional Access Segment software").

44. Under Section 18.1 of the Security Services Agreement (titled "Competitive Assessment"), DIRECTV was permitted, "at its sole discretion," to perform a "competitive assessment of potential alternative Conditional Access Service ***providers***" "[a]t any time following the third (3rd) anniversary of the Effective Date" (i.e., after March 1, 2007).[3] That is, contrary to Synamedia's

[3] The Security Services Agreement defines "Conditional Access Service" as "the services, including provision of a supply of CAMs (and, if applicable, IRD Chips) required by DIRECTV to operate the portion of the Conditional Access Segment in





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

extracontractual argument, a Competitive Assessment allows DIRECTV to assess whether a potential alternative provider—DIRECTV or a third-party (including competitors of Synamedia)—can provide the same Conditional Access Service (DIRECTV's conditional access system) as an alternative to Synamedia. A Competitive Assessment is a means by which DIRECTV is able to understand the cost for either DIRECTV or a third-party to replace Synamedia as DIRECTV's conditional access service provider. Initiation of a competitive assessment signals to Synamedia that DIRECTV is considering or intending to move away from Synamedia and is taking concrete steps to evaluate alternative providers. Contrary to Synamedia's position, nothing in the Security Services Agreement requires DIRECTV to change to an alternative conditional access system; rather, the Security Services Agreement expressly provides that DIRECTV may, "at its sole discretion," "initiate" the competitive assessment to potentially replace Synamedia with an alternative provider without requiring an alternative conditional access system.

45. Additionally, under Section 18.2 (titled "Transition Declaration"), DIRECTV was permitted "at its sole discretion" to declare a Transition "[a]t any time following the third (3rd) anniversary of the Effective Date" (i.e., after March 1, 2007), resulting in "additional rights and obligations." Those "additional rights" specifically include a "Transition License" pursuant to Section 18.2.1, which permitted DIRECTV's "commercial use" of the "CAS components" "after the Term."[4] Again, nothing in the Security Services Agreement requires DIRECTV to

support of the DIRECTV Service, including security technical operations and other services described in this Agreement and in the Statement of Work."

[4] The Security Services Agreement defines the CAS as "the conditional access segment of the DIRECTV Service," which "includes *inter alia* the CAMC, the Broadcast Control Center (BCC), the conditional access uplink system, call-back server, Licensed Technology, Verifier, signature servers and CAMs (and, if applicable, IRD Chips) used in support of the DIRECTV Service" and the Licensed Technology as "all technology, tangible and non-tangible assets which have been created, developed or licensed by or on behalf of [Synamedia]."



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

move to, or develop, an alternative conditional access system as part of a Transition.

46. Section 9.1.2 (titled "Licenses to DIRECTV After the Term") provides DIRECTV with a perpetual right and license to the intellectual property and know-how relating to DIRECTV's Conditional Access Segment (a) "[u]pon termination of [the Security Services Agreement]," which DIRECTV terminated on June 18, 2024, and/or (b) "[i]n the event DIRECTV declares a Transition," which DIRECTV did effective April 30, 2024. The perpetual right and license reflects DIRECTV's foundational role in advancing the technical capabilities of DIRECTV's Conditional Access Segment and the settlement of its dispute with NDS, whereby DIRECTV transferred its intellectual property rights in its conditional access module designs (including the unhackable D1 smart card) to NDS, whose own technology had been repeatedly hacked. Under Section 9.1.2, DIRECTV's "perpetual right and license" includes rights to Synamedia's Intellectual Property Rights "reasonably required for DIRECTV's full and unrestricted exercise and enjoyment" of all rights contemplated by the Security Services Agreement, "including the right to use and make derivative works of any head end software and systems" with or without third-party competitors of Synamedia.

47. Section 18.2.1 (titled "Transition License") provides that "DIRECTV shall have the [perpetual license] rights set forth in Section 9.1.2 during the remainder of the Term, Provided However that such rights may be used only for the purposes of analyzing and developing components of the CAS, but not for provision or commercial use of such CAS components until after the Term." Section 9.1.1 of the Security Services Agreement (titled "License to DIRECTV During Term") provides that "[i]n the event DIRECTV declares a Transition pursuant to Section 18.2, the additional license as set forth in Section 18.2.1 shall also apply, both during and after the Term."

48. Section 7.5.1 (titled "Establishing the [Technology Escrow] Account") requires Synamedia to deposit and maintain documentation pertaining to the technology DIRECTV licensed and incorporated into its Conditional Access Segment in a "Technology Escrow Account." Section 7.5.2 (titled "Sufficiency of Deposits") specifically requires the materials deposited to "contain as much information as reasonably possible in human-readable form, and be contained on media suitable to enable reasonably skilled programmers or analysts to understand, maintain and support the Condition[al] Access Segment including the development of new components (such as CAMs) and subsystems that will be integrated and used in the Conditional Access System." This documentation includes source code and card generation serialization keys. Section 7.5.2 also required Synamedia to "update the materials deposited in the Technology Escrow Account to completely and accurately reflect any substantive additions, modifications, improvements or other changes to the Conditional Access Segment within sixty (60) days." Synamedia deposited technology relating to DIRECTV's Conditional Access Segment into a technology escrow account as recently as February 28, 2024.

49. Separately, a declaration of Transition provides DIRECTV, in exchange for additional consideration, with expanded license rights to Synamedia's Intellectual Property Rights. DIRECTV may use these expanded license rights to analyze and develop components of the Conditional Access Segment during the term of the Security Services Agreement and allows for commercial use of the Conditional Access Segment after the term of the Security Services Agreement.

50. Section 7.5.4 (titled "Access to Escrow") provides DIRECTV "the right to access the contents of the Technology Escrow Account" "in the event that the parties agree that DIRECTV has declared a Transition" or if a Synamedia breach leads to termination of the Security Services Agreement without DIRECTV declaring a Transition.

51. Under the Security Services Agreement, a "Transition" "means the evolution of this Agreement toward termination or expiration thereof, beginning upon the written declaration of Transition by DIRECTV."

52. Section 18 of the Security Services Agreement provides a Transition procedure that the parties agreed to and are obligated to follow once DIRECTV declares a Transition.

53. Under the original terms of the Security Services Agreement, DIRECTV had the right "at its sole discretion" to declare a Transition any time after March 1, 2007. DIRECTV declared a Transition, in writing, on April 29, 2024. Due to time differences between the parties, the parties agreed to treat the Declaration of Transition as having been made on April 30, 2024.

54. DIRECTV's Declaration of Transition entitles Synamedia to additional consideration of [redacted] per year for five years following DIRECTV's Declaration of Transition, the first payment being due within 90 days of the Declaration of Transition.

55. DIRECTV wired its payment of [redacted] to Synamedia on July 5, 2024, for the Transition License Fee. Synamedia refused payment and returned the wire on July 11, 2024.

56. Under Section 18.2.5 (titled "Technology and Information Transfer"), DIRECTV's Declaration of Transition obligated Synamedia, within 60 days (i.e., by June 29, 2024), to "provide DIRECTV with the escrowed materials and all NDS Documentation regarding the Licensed Technology as it is incorporated into, or used in any manner, directly or indirectly, in connection with supporting, improving, maintaining, or otherwise enjoying the Conditional Access Segment at any time during the Term of this Agreement."

57. Section 18.2.5 provides a list of the materials Synamedia is obligated to provide following a declaration of Transition. Synamedia's obligation to provide DIRECTV with technical materials is independent of its obligation to deposit such





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

materials in the Technology Escrow Account. To that end, the Security Services Agreement, in Section 18.2.5, provides for Synamedia's delivery of "a complete set of NDS Documentation in electronic and hard copy form" including the following:

a. "a list of changes made by NDS for all conditional access headend systems;"

b. "clarification of the extent to which revisions to the Verifier have been distributed, including a list of major differences between the modified verifier and earlier verifiers, and the source code for all versions of verifiers in use in any IRDs;"

c. "a list of major differences between each CAM generation;"

d. "the Necessary Specifications;" and

e. "if DIRECTV elects to receive Source Code (in whole or in part) pursuant to Section 18.2.3, the requested Source Code."

58. Under Section 18.2.6 (titled "Continuing Obligations of [Synamedia]"), after a declaration of Transition, Synamedia remains obligated to "continue in good faith to provide all services and materials pursuant to the requirements of this Agreement," including fulfilling DIRECTV purchase orders for smart cards.

59. Under Section 18.2.7 (titled "Additional Transition Services of [Synamedia]"), Synamedia remains obligated to provide additional Transition services even after the Term of the Security Services Agreement.

60. On November 27, 2007, DIRECTV and NDS entered into a Term Sheet related to the Security Services Agreement to "summarize[] the principal terms and conditions of a proposed extended security services agreement between the parties." The 2007 Term Sheet is attached hereto as Exhibit B. In relevant part, the 2007 Term Sheet provided DIRECTV's and NDS's intent and understanding regarding DIRECTV's rights and NDS's contractual obligations, including NDS's

contractual obligation (and later Synamedia's) to continue providing Transition services *after* the Term of the Security Services Agreement. For example, the 2007 Term Sheet provides "DIRECTV's right to initiate" and "the obligations of NDS" with respect to providing CAMs "shall continue for 18 months after expiration of the Term" of the Security Services Agreement. The 2007 Term Sheet additionally states, "[c]onsistent with Section 18.2.7 of the SSA, following the Term and continuing for 36 months thereafter, if requested by DIRECTV, NDS will continue in good faith to… provide other Conditional Access Services requested under Change Request necessary to support the Transition, on a time and materials basis."

61. The Transition procedure of the Security Services Agreement was specifically bargained for, and the Parties agreed to the terms of the Transition procedure. The Transition procedure, like DIRECTV's perpetual right and license, reflects DIRECTV's significant technical advancement of smart-card technology, was described in the 1992 CASSA, and was designed to ensure that NDS would provide both technology and value apace with its competition (including, potentially, DIRECTV should DIRECTV choose to operate and maintain its Conditional Access Segment in-house). Contrary to Synamedia's position, nothing in the Transition procedure or the Security Services Agreement requires DIRECTV to transition to an alternative conditional access system; rather, the Security Services Agreement expressly provides that DIRECTV may, "at its sole discretion," "initiate a competitive assessment of potential alternative Conditional Access Service providers" to enable DIRECTV to understand the cost for either DIRECTV or a third-party (including competitors of Synamedia) to replace Synamedia as DIRECTV's conditional access system provider.

62. Synamedia, through its words and actions, has signaled a concrete unwillingness to cooperate with DIRECTV's Transition in Breach of the Security

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Services Agreement and in an attempt to coerce DIRECTV into an extension of the Security Services Agreement on unreasonable terms.

63. Despite DIRECTV's April 30, 2024 Declaration of Transition, Synamedia has failed to provide the Licensed Technology, the source code, a complete set of NDS Documentation, Additional Transition Services or other Conditional Access Services as requested by DIRECTV, and other information pursuant to Section 18.2.5 of the Security Services Agreement.

**Developments Regarding the Security Services Agreement**

64. Since 2004, the Security Services Agreement has been restructured multiple times to extend the term, change the pricing, and account for multiple changes of control of Synamedia.

65. The most recent term and pricing structure reflect the last successful negotiation between the parties in 2021.

**DIRECTV'S CURRENT DISPUTE WITH SYNAMEDIA**

**Contract Disputes**

66. The Security Services Agreement was set to expire on July 31, 2024.

67. Around 2014, [redacted] The date issue renders affected equipment unusable unless the software is updated to reset the issue. Despite causing the mistake, Synamedia demanded that DIRECTV pay millions of dollars in additional work orders to remedy Synamedia's error. DIRECTV was left with no other choice but to concede to Synamedia's terms due to DIRECTV's unfamiliarity with the Synamedia software and lack of internal resources.

68. Although the parties had worked cooperatively under the Security Services Agreement for over a decade, the relationship between DIRECTV and

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Synamedia continued to deteriorate  after Synamedia's private-equity acquisition by Permira in or around 2018.

69. Instead of investing resources to develop the Conditional Access Segment, as it was contractually obligated to do, in or around 2018, Synamedia began sending responsibility for maintenance of the system to Israel and India (to what DIRECTV only recently learned were affiliates of Synamedia).

70. Synamedia, in a clear effort to cut costs, continued to move and eliminate resources that were contractually required to be dedicated to support the DIRECTV conditional access system.

71. The market for satellite television services changed dramatically during this same period. Both Synamedia and DIRECTV knew that with dramatic consumer shifts to streaming content and significant decline to DIRECTV's subscriber base, it was not financially feasible for DIRECTV to renew the Security Services Agreement using the same or similar financial terms.

72. In the years leading up to Synamedia's eventual Breach and the termination of the Security Services Agreement, DIRECTV made numerous attempts to engage Synamedia on renegotiated terms and an extension of the Security Services Agreement.

73. DIRECTV formally approached Synamedia to renegotiate renewal terms on July 23, 2022, more than two years in advance of the Security Service Agreement's set expiration. However, Synamedia refused to negotiate with DIRECTV.

74. After Synamedia continued to refuse to renegotiate terms for approximately one year, and faced with no other options, on June 22, 2023, DIRECTV initiated a Competitive Assessment as the first step to initiating a Transition away from Synamedia as the service provider. DIRECTV worked with [redacted], a Synamedia competitor, to determine whether [redacted] could be a potential alternative provider of DIRECTV's conditional access system.

75. Like with the renegotiation of renewal terms, Synamedia delayed providing the information necessary for the Competitive Assessment, impacting DIRECTV's ability to conduct the Competitive Assessment. For example, DIRECTV sent Synamedia a request for the Unique Secrets ("US") key for four Receiver IDs on December 4, 2023 in order to test a potential replacement conditional access system. A month later when Synamedia still refused to provide the US keys, in January 2024, DIRECTV requested a meeting with Synamedia to discuss how to provide the US keys for all Receiver IDs in the event DIRECTV declared a Transition. After numerous discussions and business escalations, Synamedia finally provided the four US keys on January 24, 2024. Synamedia, however, refused to answer simple questions about the proper use of the US keys for more than a month after they were delivered.

76. Only after DIRECTV took concrete steps to initiate the process of securing an alternative conditional access system services provider did Synamedia engage in renewal negotiations. By this time—January 2024—DIRECTV had devoted significant resources into finding an alternative to having Synamedia service the conditional access system.

77. The technology incorporated into the Conditional Access Segment has stabilized and matured, thanks in large part to the technology DIRECTV originally developed, which put an end to the perpetual hacking problem of the late-1990s and early 2000s.

78. As a result of the Competitive Assessment, DIRECTV now knew that, given the mature state of the technology which had progressed to routine and limited maintenance and with a fix to the date-rollback issue already in place, DIRECTV would be capable (with significant investment) of maintaining the conditional access system in-house for the limited remainder of its useful life.

79. DIRECTV and Synamedia exchanged numerous proposals and counter-offers but could not come to terms.

80. The intellectual-property terms of the Security Services Agreement and DIRECTV's perpetual right and license to use, enjoy, and commercialize the intellectual property relating to the Conditional Access Segment after the Term of the Security Services Agreement are clear and reflect DIRECTV's extensive investment in its conditional access system and its role in originally developing the unhackable Conditional Access Segment in 2001. To this day, DIRECTV's Conditional Access Segment incorporates technology DIRECTV developed and incorporated into the D1 smart card.

81. Nearly two years after initially attempting to secure a renewed Agreement with Synamedia, on April 29, 2024 (effective as of April 30, 2024), DIRECTV declared a Transition. DIRECTV's Declaration of Transition should not have surprised Synamedia given DIRECTV's continued good faith attempts to negotiate reasonable terms for extension of the Security Services Agreement (and Synamedia's repeated rejections), DIRECTV's competitive assessment in 2023 with a competitor to Synamedia, and DIRECTV's January 2024 request for a meeting to plan how a transition might take place.

82. Pursuant to Section 18.2 of the Security Services Agreement, DIRECTV intends to bring the continued provision, maintenance, and ongoing and future development of its Conditional Access Segment in-house and, by declaring a Transition, has exercised its rights under the Security Services Agreement to do so.

83. The Transition process was initiated and had commenced, when DIRECTV's Competitive Assessment began 13 months prior to the anticipated expiration of the SSA, thus beginning "the evolution of" the SSA "toward termination or expiration" in accordance with the definition of "Transition" in Section 1 of the Security Services Agreement.

84. Any appearance that no Transition efforts were made was manufactured by Synamedia because it impeded DIRECTV's Competitive

Assessment and Transition efforts, allowing it to unilaterally create a self-serving conundrum by running out the rest of the Term of the Security Services Agreement and then later arguing DIRECTV's Transition efforts were untimely rather than using the remaining Term of the Security Services Agreement to cooperate with DIRECTV's Transition efforts as it was contractually obligated to do.

85. In effect, even before DIRECTV's Transition Declaration—which should have triggered a cohesive, harmonious, and non-contentious Transition process—Synamedia ensured Transition could not take place without judicial intervention by denying access to the intellectual property and know-how relating to DIRECTV's Conditional Access Segment required for DIRECTV to bring continued operation and maintenance of its Conditional Access Segment in-house.

86. Rather than cooperating with DIRECTV and complying with its Transition obligations, Synamedia went radio silent, refused to fulfill DIRECTV's purchase orders for new CAMs, threatened to destroy existing CAMs, tampered with electronic files DIRECTV needed to activate its equipment, and challenged the credentials and seniority of DIRECTV's designated dispute resolution personnel.

87. DIRECTV estimated Transition would have been a 6-12 month process had Synamedia cooperated (such that the Transition would have been about halfway completed by the end of the Term of the Security Services Agreement, well within the timeframe contemplated by the Parties' 2007 Term Sheet).

88. As a consequence of Synamedia's refusal to acknowledge the validity of DIRECTV's written Declaration of Transition, refusal to participate in the Transition process, and refusal to provide specific Additional Transition Services or other Conditional Access Services requested by DIRECTV, Synamedia deprived DIRECTV of over three months of services for which DIRECTV compensated Synamedia during the Term. For example, under Section 18.2.5,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

following "DIRECTV declar[ing] a Transition as described in Section 18.2" Synamedia was obligated to "provide DIRECTV with the escrowed materials and all NDS Documentation regarding the Licensed Technology as it is incorporated into, or used in any manner, directly or indirectly, in connection with supporting, improving, maintaining or otherwise enjoying the Conditional Access Segment" "within sixty (60) days." If Synamedia had fulfilled this contractual obligation, DIRECTV would have been able to access this necessary technology and documents to enable its continued Transition efforts by the end of June 2024. Instead, DIRECTV was left with no choice but to terminate the Security Services Agreement as the contractual remedy for removing Synamedia's impediment to its Transition efforts.

89. Hoping instead for another extension of the Security Services Agreement and fearing its replacement was imminent, Synamedia asserted several false and extracontractual arguments and impeded DIRECTV's contractually outlined Transition efforts. Synamedia acted in this manner attempting to coerce DIRECTV to abandon transitioning service of the conditional access system to itself and to unduly influence DIRECTV so it would be more painful to sever ties than to accede to Synamedia's unreasonable demands. Synamedia's actions necessitated DIRECTV's termination of the Security Services Agreement.

90. On May 1, 2024, DIRECTV issued a "Notice of Material Breach" to Synamedia detailing Synamedia's material breach of the Security Services Agreement by refusing to accept DIRECTV's Purchase Order No. 30766490 for SIMs cards.

91. On May 6, 2024, Synamedia replied to DIRECTV's written Declaration of Transition, contesting the validity of the Transition.

92. On May 9, 2024, DIRECTV replied to Synamedia, refuted Synamedia's position, and reiterated that DIRECTV validly declared a Transition. By May 17, 2024, Synamedia had not responded to DIRECTV.

93. On May 17, 2024, DIRECTV issued a "Notice of Synamedia's Material Breach" to Synamedia detailing Synamedia's material breach of the Security Services Agreement by failing to recognize the validity of DIRECTV's Declaration of Transition, which, under the terms of the Agreement, began a ten-business-day period for Synamedia to provide a plan to cure the breach and a 30-day period to remedy the breach. The Notice of Synamedia's Material Breach notified Synamedia that, by virtue of its breach, Synamedia was:

1. Denying DIRECTV its Transition License, including the Licenses to DIRECTV After the Term, provided for by Sections 18.2.1 and 9.1.2 of the Security Services Agreement;

2. Denying DIRECTV its right to access the contents of the Technology Escrow Account as provided for by Section 7.5.4 of the Security Services Agreement;

3. Denying DIRECTV's Source Code License provided for by Section 18.2.3 of the Security Services Agreement;

4. Refusing to transfer the materials, technology, and information provided for by Section 18.2.5 of the Security Services Agreement; and

5. Refusing to provide Transition Services, including but not limited to the supply of CAMs, after the Term pursuant to Section 18.2.7 of the Security Services Agreement.

94. Synamedia failed to remedy its breaches or offer a plan to cure those breaches, and, on June 18, 2024, DIRECTV formally notified Synamedia that it terminated the Security Services Agreement, effective immediately.

95. In failing to recognize DIRECTV's declaration of Transition or undertake any of its Transition obligations, Synamedia Breached the Agreement, leading to its termination on June 18, 2024, following Synamedia's failure to remedy its Breach.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

96. The termination of the Security Services Agreement spelled the end of a longstanding, 30-year relationship between DIRECTV and Synamedia.

97. Synamedia's actions since DIRECTV's Declaration of Transition demonstrate Synamedia's bad faith and intent to block DIRECTV's Transition efforts. Synamedia has refused and continues to refuse to participate in the Transition process and to honor the perpetual right and license for which DIRECTV has compensated Synamedia, precluding DIRECTV from future access to the licensed intellectual property for which DIRECTV provided the foundational development work.

98. Synamedia's Transition obligations survive termination of the Agreement, including its technology transfer obligations in Section 18.2.5 and its Additional Transition Services obligations in Section 18.2.7.

99. Synamedia was obligated to complete the technology transfer of all documents and information, including source code, specified in Section 18.2.5 of the Agreement by June 29, 2024. Synamedia failed to complete the technology transfer.

100. Synamedia's failure to fulfill its obligations under the Security Services Agreement, including specifically by failing to complete the technology transfer pursuant to Section 18.2.5 thereof, constitutes a Breach of the Security Services Agreement.

101. Under Section 18.2.7 of the Security Services Agreement, "[u]pon termination or expiration of the Agreement for any reason," Synamedia was, is, and remains obligated to "provide such Conditional Access Services as requested by DIRECTV (including, if requested, a continued supply of CAMs and necessary support services including personalization/serialization, and including continued support for Security Technical Operations including ECMs) on a time and materials basis."

102. DIRECTV has unequivocally requested Additional Transition Services and other Conditional Access Services from Synamedia as contemplated by Section 18.2.7 of the Security Services Agreement and later restated in the 2007 Term Sheet. Rather than provide such requested services and in contrast to its obligations under Section 18.2.7 of the Security Services Agreement, Synamedia has instead taken numerous, overt actions to effectively turn off DIRECTV's ability to use its Conditional Access Segment and to interfere with DIRECTV's supply chain.

103. Synamedia's failure to fulfill its obligations under the Security Services Agreement, including specifically by failing to provide the Additional Transition Services and other Conditional Access Services requested by DIRECTV pursuant to Section 18.2.7 thereof, constitutes a Breach of the Security Services Agreement.

104. Under Section 18.2.7 of the Agreement, Synamedia was obligated to store the CAMs DIRECTV ordered in a safe and environmentally appropriate manner pending their transfer to DIRECTV.

105. On August 9, 2024, Synamedia demanded that DIRECTV remove its inventory of recycled CAMs by October 9, 2024, or Synamedia would organize those CAMs for their destruction.

106. Prior to August 9, 2024, DIRECTV placed Transfer Orders for approximately [redacted] to ship by August 12, 2024, [redacted] to ship by August 19, 2024 and 200,000 to ship by August 26, 2024. On August 14, 2024, to meet Synamedia's imposed deadline, DIRECTV placed five new Transfer Orders for approximately [redacted] recycled cards. DIRECTV made several requests for Synamedia to confirm it had shipped or would ship DIRECTV's recycled CAMs to meet the Synamedia-imposed deadline.



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

107. Despite issuing the arbitrary deadline, Synamedia stated it would not comply with the Transfer Orders for DIRECTV's recycled cards. As such, to retrieve its cards before the looming Synamedia-mandated destruction deadline of October 9, 2024, DIRECTV ordered a truck and wrote to Synamedia on August 26, 2024, requesting to start physically collecting the cards at Synamedia's Costa Mesa facility on August 28, 2024. On August 27, 2024, Synamedia refused to allow DIRECTV to collect its cards and stated "Synamedia cannot accommodate that request." On September 4, 2024, DIRECTV was forced to physically collect its approximately [redacted] new and recycled smart cards, because Synamedia refused to comply with the Transfer Orders. DIRECTV subsequently received the remaining smart cards only after repeated requests to Synamedia.

108. Synamedia's failures to keep safe and timely transfer to DIRECTV the recycled CAMs due to have shipped by August 26, 2024, constitutes a breach of Synamedia's Additional Transition Services Obligations under Section 18.2.7 of the Agreement.

109. DIRECTV's Conditional Access Segment is critical to its business and enables DIRECTV to provide satellite television services only to its paying customers, while blocking all unpaid and unauthorized access. In other words, it supports DIRECTV's compliance with its various agreements with television broadcast networks, which ensures continued revenue. If DIRECTV cannot encrypt its satellite television signals, its contracts with content providers would be in jeopardy.

110. DIRECTV has substantially complied with its material obligations under the Security Services Agreement and has performed all conditions precedent necessary to file these counterclaims.

111. Synamedia has invalidly rejected DIRECTV's Declaration of Transition, refused to participate in the Transition in good faith as required by the Security Services Agreement, and has ceased providing any assistance with the





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Transition or enabling DIRECTV's continued access to and use of its Conditional Access Segment after July 31, 2024, contrary to its obligations under the Security Services Agreement, thereby necessitating DIRECTV's termination of the Security Services Agreement. In particular, Synamedia erroneously claims that, in Synamedia's view, DIRECTV's Declaration of Transition was invalid because DIRECTV did not have sufficient time to conduct the Transition by developing, building, and phasing-in a new conditional access system and DIRECTV has no right to use the existing Conditional Access System or Synamedia's intellectual property after the Term of the Security Services Agreement. Synamedia's claims are contrary to and refuted by numerous express provisions of the Security Services Agreement.



112. Synamedia's reading of the Security Services Agreement is wrong and based on arguments not found within the four corners of the Security Services Agreement. Perhaps most glaringly, the Transition portion of the Security Services Agreement (Article 18) imposes no requirement for DIRECTV to develop, build, or phase-in a new conditional access system, either prior to or after the end of the Term of the Security Services Agreement, nor prevents DIRECTV's use of the existing Conditional Access System or Synamedia's intellectual property after the Term of the Security Services Agreement. Instead, Section 18.2 specifically provides that "***at any time***…DIRECTV may ***<u>at its sole discretion</u> initiate*** a Transition." Accordingly, the Security Services Agreement specifically contemplates the need or desire for DIRECTV, "at its sole discretion," to initiate a Transition, thereby providing DIRECTV with additional Transition-related rights that might mitigate disruption to the Conditional Access Segment and its components, which were created a decade prior to the Security Services Agreement. DIRECTV's bargained-for Transition-related and perpetual right and license reflect DIRECTV's foundational role in advancing the technical capabilities of DIRECTV's Conditional Access Segment—the technology that has

been ingrained in DIRECTV's Conditional Access Segment since 1994, and that DIRECTV developed, was forced to assign to Synamedia when the parties were under the mutual control of News Corporation, and licensed back from Synamedia for decades. Synamedia has not—and cannot—identify any contractual language enabling it to invalidate a Transition or supporting that DIRECTV could impliedly waive its Transition rights by not acting fast enough.

113. Nothing in the Security Services Agreement requires DIRECTV to move to, or develop, an alternative conditional access system as part of a Transition nor makes a Transition contingent on DIRECTV developing a new conditional access system either on its own or with a third party. Following DIRECTV's declaration of Transition, the scope of DIRECTV's permissible activities expands.

114. Additionally, Synamedia's timeliness argument cannot be squared with the other express terms of the Security Services Agreement highlighted above. For example, it would not make sense to require only ten days' notice pursuant to Section 18.3, for the Article 18 Transition-related rights to survive expiration or termination pursuant to Section 21.3, or for Synamedia employees to use and disclose Synamedia's proprietary information relating to any portions of the CAS to DIRECTV within six months of expiration if DIRECTV was required to develop, build, and phase-in a new conditional access system prior to the end of the Term of the Security Services Agreement, which Synamedia claims would take "two or more years, not three months." Dkt. 255, ¶ 46.

115. Similarly, Synamedia's perpetual license argument is equally unavailing. It would be entirely illogical for DIRECTV to have the perpetual right and license set forth in Section 9.1.2 for the provision or commercial use of the CAS components "after the Term" pursuant to Section 18.2.1 or for DIRECTV to be pay royalty fees for the CAMs "after the Term" pursuant to Section 18.2.4 if DIRECTV had no right to use its existing Conditional Access Segment or

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Synamedia's intellectual property after the Term of the Security Services Agreement, as Synamedia wrongly argues.

116. For example, Section 18.2.1 (titled "Transition License") permits DIRECTV to "analyz[e] and develop[] components of the CAS" "during the remainder of the Term" and DIRECTV's "commercial use" of the "CAS components" "after the Term." It would be illogical to provide DIRECTV license to analyze and develop components of the Conditional Access Segment during the remainder of the Term if DIRECTV were required to move to a new conditional access system after the Term, and DIRECTV's right to commercially use such Conditional Access Segment components would be useless in a new conditional access system.

117. Moreover, limiting Section 18.2.1 as Synamedia advocates would obviate DIRECTV's post-Term rights provided for by the 2007 Term Sheet, including "DIRECTV's right to initiate" CAM replacements "for 18 months after expiration of the Term" and right to "request[] other Conditional Access Services…following the Term and continuing for 36 months thereafter…[c]onsistent with Section 18.2.7 of the SSA."

118. Further yet, Section 18.2.5 (titled "Technology and Information Transfer") requires Synamedia to provide DIRECTV with the "the escrowed materials and all NDS Documentation regarding the Licensed Technology as it is incorporated into, or used in any manner, directly or indirectly, in connection with supporting, improving, maintaining or otherwise enjoying the Conditional Access Segment" within 60 days of the Declaration of Transition as well as the "DIRECTV Conditional Access Segment technology under development" "at the time of Termination," independent of its obligation to deposit such materials in the Technology Escrow Account. Section 18.2.6 (titled "Continuing Obligations of [Synamedia]"), on the other hand, obligates Synamedia to "continue in good faith to provide all services and materials pursuant to the requirements of this

Agreement" following a declaration of Transition. It would be illogical to allow DIRECTV to access such materials "in connection with supporting, improving, maintaining or otherwise enjoying the Conditional Access Segment" or to require Synamedia to continue providing services and materials for the existing Conditional Access Segment if DIRECTV is not entitled to transition its existing Conditional Access Segment in-house.

119. Section 18.2.7 (titled "Additional Transition Services of [Synamedia]") requires Synamedia to provide "Conditional Access Services as requested by DIRECTV," including a continued supply of smart cards and serialization services, "[u]pon termination or expiration" of the Security Services Agreement "for any reason." If a Transition required DIRECTV to move to a new conditional access system, none of the "Additional Transition Services" in Section 18.2.7 would be required, necessary, or allowed because the "continued supply of CAMs and necessary support services including personalization/serialization, and including continued support for Security Technical Operations including ECMs" called for in Section 18.2.7 would be inapplicable to and unusable with such a new conditional access system. .

120. As another example, the "additional license" of Section 18.2.1 that applies "both during and after the Term" pursuant to Section 9.1.1 and the perpetual right and license that applies "upon termination" or "[i]n the event DIRECTV declares a Transition" pursuant to Section 9.1.2 would likewise be rendered useless if DIRECTV had no right to exercise such licenses after the Term and was required to develop, build, and phase-in a new conditional access system prior to the end of the Term.

121. As yet another example, Section 18.2.2 (titled "Transition License Fees") requires DIRECTV to pay to Synamedia a "Transition License Fee" costing DIRECTV [redacted] per year for five years "provided DIRECTV does not disclose [Synamedia] IPR to a Competing Person of [Synamedia]" (i.e., if DIRECTV elects

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

to transition maintenance and operation of its Conditional Access Segment in-house). Again, it would be illogical to require DIRECTV to pay Synamedia [redacted] for an in-house Transition License Fee over five years post-Term if DIRECTV is not entitled to transition its existing Conditional Access Segment in-house.

122. DIRECTV already paid Synamedia's predecessor for building the Conditional Access Segment, Synamedia was compensated for its maintenance of the Conditional Access Segment over 20 years, and the Transition License Fee under Section 18.2.2 is "additional consideration for the license set forth in Section 18.2.1." Once the Conditional Access Segment technology had stabilized and matured, the Security Services Agreement contemplated Synamedia would be compensated for minimal additional Transition services during the post-Term wind-down period and would then be replaced completely and asked to do nothing. If DIRECTV were required to build a new conditional access system without Synamedia's IPR, DIRECTV would be required to compensate Synamedia for nothing, and DIRECTV's right to receive CAMs and Additional Transition Services and other Conditional Access Services post-Term would be rendered useless.

123. Synamedia's refusal to cooperate with the Transition during the pendency of this litigation also violates Synamedia's obligations under Section 13.6 of the Security Services Agreement, which expressly provides: "[i]n no event shall the application of the dispute resolution procedures set forth in this Article 13 serve to relieve either Party of its obligations under this Agreement, ***including those which are the subject of the resolution dispute***, until such time as there is a final resolution of the dispute in accordance with this Article 13."

124. Synamedia's claims for relief based on DIRECTV's alleged continued use of intellectual property relating to DIRECTV's Conditional Access Segment as well as the middleware operating on its set-top boxes and satellite receivers are barred by Section 14(b) of the Middleware Development and License Agreement,

which expressly provides: "[Synamedia] covenants…neither [Synamedia] nor any of its subsidiaries shall assert against DIRECTV…***any claim of infringement of any patent***, mask work, ***trade secret***, ***copyright or other Intellectual Property Rights***[5] owned or controlled by [Synamedia] or [Synamedia]'s subsidiaries in ***any Deliverables or Intellectual Property Rights provided pursuant to this Agreement or any other deliverables or intellectual property provided pursuant to the SSA*** ('NDS IP'), which claims arises from or relates to…(b) ***continued use and support of any satellite television receiving equipment*** made prior to such termination of this Agreement (including continued use and support thereof after termination of this Agreement)."

125. Beyond Synamedia's refusal to uphold its end of the bargain, Synamedia's words and inaction have created an urgent situation for DIRECTV. Well after this case was filed, Synamedia went out of its way to disrupt the status quo by threatening the sole supplier of serialized chips for the CAMs in DIRECTV's Conditional Access Segment, interfering with DIRECTV's supply chain and customer relationships in an attempt to shut down the manufacture of satellite receivers. The critical chip supplier stopped producing serialized chips for DIRECTV satellite receivers, and now DIRECTV cannot have more satellite receivers made. DIRECTV's inventory will deplete and, once that happens, DIRECTV will be unable to add new customers or replace equipment for existing customers.

126. Synamedia's conduct jeopardizes DIRECTV's ability to provide satellite television services [redacted] DIRECTV subscribers across the United States. On average, [redacted] Synamedia's actions also jeopardize DIRECTV's customer and supply-chain relationships.

[5] The Middleware Development and License Agreement defines "Intellectual Property Rights" to include "all inventions," "all copyrights," "all registered trade secrets," and "any other similar rights or intangible asserts."





BAKER & HOSTETLER LLP ATTORNEYS AT LAW LOS ANGELES

127. DIRECTV's Conditional Access Segment has been ingrained in DIRECTV's business for decades and is critical for its continued ability to generate revenue and provide television services to its customers. DIRECTV has current and ongoing rights to the technology, and Synamedia's weaponization of the technology by virtue of its physical custody and control over the technology and documents DIRECTV needs to take over maintenance of its Conditional Access Segment has created an emergency risk of concrete, immediate harm to DIRECTV's business. Both Synamedia and DIRECTV know that with dramatic consumer shifts to streaming content and significant decline to DIRECTV's subscriber base, it is not financially feasible for DIRECTV to implement a new or alternative conditional access system into its existing products.

128. [redacted]. To avoid inventory issues, DIRECTV orders satellite receivers from its equipment manufacturers [redacted].





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

129. Due to Synamedia's interference with DIRECTV's supply chain, [redacted] has stopped fulfilling orders for serialized chips placed by DIRECTV's equipment manufacturers. [redacted]

130. [redacted].

131. The effects of Synamedia's supply-chain interference will [redacted]

132. [redacted].

133. [redacted]

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

[redacted]

134. Absent Synamedia's compliance with its obligations under the Agreement, DIRECTV's ability to seamlessly provide services to its subscribers will be impacted. The television and subscription video industry is extremely competitive, and a service disruption almost certainly would cause DIRECTV's [redacted] subscribers to become disgruntled and switch to a competitor. Once DIRECTV loses a subscriber, it will likely be lost forever, as subscribers very rarely return to their previous pay-television provider.

135. Additionally, late in 2024, Synamedia shuttered its Costa Mesa, California facility, where a large amount of the work supporting DIRECTV's Conditional Access Segment was based. Section 5.1.3 of the Security Services Agreement (titled "Delivery of CAMs") provides the CAMs shall be delivered from Synamedia's facility in Lake Forest, California "or such other facility operated by [Synamedia] ***in the Territory as may be aggregable to DIRECTV*** ('CAM Delivery Points')," provides DIRECTV "the right to review and reasonably approve the security and storage procedures in place at the CAM Delivery Points," and requires Synamedia to "ship CAMs from the CAM Delivery Points to locations as directed by DIRECTV." The Security Services Agreement defines "Territory" as "the United States of America (including its territories and possessions) and, if at any time DIRECTV is legally permitted to provide direct-to-home services in Canada, the United States and Canada (including their territories and possessions)." Section 18.2.7 requires, "[u]pon termination or expiration of

this Agreement ***for any reason***," Synamedia to "provide such Conditional Access Services as requested by DIRECTV (including, if requested, a ***continued supply of CAMs*** and necessary support services including personalization/serialization, and including continued support for Security Technical Operations including ECMs) on a time and materials basis."

136. Synamedia's decision to shut down operations at its Costa Mesa, California facility and to stop supporting DIRECTV's Conditional Access Segment (including by actively interfering with DIRECTV's continued supply of CAMs) constitutes a breach of the Security Services Agreement.

137. DIRECTV's ability to provide satellite television services [redacted]—is now in jeopardy because of Synamedia's refusal to live up to its obligations.

138. Additionally, DIRECTV estimates [redacted].

139. Upon information and belief, Synamedia does not have sufficient assets to satisfy a judgment of DIRECTV's claims in favor of DIRECTV should Synamedia's breaches continue through the end of this lawsuit.

140. Accordingly, DIRECTV seeks a declaration of its rights, injunctive relief, and remedies for Synamedia's breaches of the Security Services Agreement and misappropriation of DIRECTV's trade secrets.

**Trade Secret Dispute**

141. Throughout the relationship between DIRECTV and Synamedia, Synamedia's project architect and development and support team have been based in California.

142. Around 2018, without DIRECTV's permission, Synamedia moved its development and support team to India, and the project architect shifted from California to Israel.

143. In addition to this geographic shift and without notifying DIRECTV, Synamedia established an Indian entity, Synamedia India Private Ltd., and an Israeli entity, Synamedia Technologies Israel Ltd. who, upon information and belief, handle the development, support and architecture work related to DIRECTV's Conditional Access Segment.

144. Following Synamedia's transition of development work to India and architecture work to Israel, Synamedia fired the primary system architect supporting DIRECTV's Conditional Access Segment in 2022.

145. On information and belief, possession of DIRECTV's confidential, proprietary, trade-secret information relating to DIRECTV's technical capabilities is necessary for Synamedia to provide development and support services and for the architect to perform its duties. The Indian software developers would need sufficient DIRECTV confidential information to understand the functional purpose and behavior of the headend systems they are developing. The architect would require a detailed understanding of any deliverables to DIRECTV, how Synamedia's deliverables interact with other DIRECTV systems, and a detailed system-wide engineering understanding of DIRECTV's systems.

146. The following list includes DIRECTV's Trade Secrets (later uses of "Trade Secrets" refer to the following list) that the software developers at Synamedia India Private Ltd. necessarily possessed to provide the software-development and support services:

1. [redacted]

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

[redacted]

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

147. The foregoing Trade Secrets are valuable because they allow DIRECTV to provide services to subscribers, restrict subscriber access to particular programming for which they are authorized, and comply with security obligations to its suppliers.

148. DIRECTV has never provided written authorization for Synamedia to share its Trade Secrets with any other entity, including Synamedia's foreign affiliates. At no time prior to this lawsuit was DIRECTV aware that individuals providing software development and support in India worked for Synamedia India Private Ltd. or any entity other than Synamedia.

149. DIRECTV took reasonable measures to protect the secrecy of its Trade Secrets. Under Section 19 of the Security Services Agreement, DIRECTV had Synamedia's assurances that any "information relating to DIRECTV Technology" would be kept in "strict confidence" and not shared without prior written approval.

150. Any decision to provide DIRECTV's confidential and trade-secret information to Synamedia's foreign affiliates was a unilateral decision made by Synamedia.

151. As a security vendor, Synamedia's unauthorized disclosure of components of DIRECTV's Conditional Access Segment, especially DIRECTV's Trade Secrets, presents a risk to DIRECTV, who is entitled to know who has access to its security software and data. The provision of the Trade Secrets, which were necessarily provided to Synamedia India Private Ltd. for it to provide software development and support services it, upon information and belief, provided over the last several years, constitutes trade-secret misappropriation. The misappropriation places DIRECTV's security-related Trade Secrets at risk.

152. The Security Services Agreement strictly controls who is entitled to have access to DIRECTV's Trade Secrets. Before DIRECTV would ever agree for another entity, particularly a foreign entity, to have access to DIRECTV's security-

related Trade Secrets, it would need to vet the entity, those working for it, and ensure that sufficiently secure protocols are in place to protect its information. The unauthorized sharing of this information with Synamedia India Private Ltd. presents actual, or at the very least threatened, harm to DIRECTV. And Synamedia's failure to provide advance notice to DIRECTV before providing Synamedia India Private Ltd. access to DIRECTV's Trade Secrets robbed DIRECTV of the opportunity to conduct sufficient due diligence.

153. Synamedia's cross-border sharing of DIRECTV's Trade Secrets with employees of affiliated entities constitutes misappropriation of DIRECTV's Trade Secrets.

**Synamedia Initiated a Campaign to Interfere with DIRECTV's Ability to Use Its Conditional Access Segment During the Pendency of the Litigation**

154. To avoid being subject to a temporary restraining order in a related case, Synamedia stated "there is nothing Synamedia can do to turn off DIRECTV's use of Synamedia's CA [conditional access] technology" and that "DIRECTV will be able to continue to deliver satellite television services to its subscribers after August 1, 2024 and to do so securely." Opp'n Appl. TRO, Case No. 24-cv-5644-PSG-KS, ECF No. 35 at 4-5, PAGEID 1111-12. Synamedia criticized DIRECTV's argument that its business was at risk of interruption as speculative and unlikely to occur.

155. Despite its representation that an interruption to DIRECTV's Conditional Access Segment was speculative and unlikely to occur, Synamedia launched a campaign to interfere with DIRECTV's business relationships and shut down its supply chain for satellite receivers.

156. [redacted] provides serialized chips for DIRECTV's satellite receivers such as set-top boxes. [redacted] serialized chips are the hardware components enabling DIRECTV's customers to access and decrypt DIRECTV's satellite broadcasts. Without a chip, a customer cannot view DIRECTV content.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

157. [redacted] is one party in a multi-party supply chain for DIRECTV satellite receivers. When [redacted] receives an order for chips from DIRECTV's satellite receiver equipment manufacturers ("OEMs"), [redacted] places an order with its silicon fabricator for the semiconductor silicon. After receiving an order from [redacted] the fabricator manufactures the silicon, cuts the silicon into chip-sized pieces, and installs electronics and pins to create chips.

158. The chips require a serialization process for enabling their decryption functionality. The serialization process involves blowing fuses inside the chip, creating an irreversible lock to the feature set on the chip. As a result, the chip is imparted with a binary code known as a serialization key. Synamedia creates the serialization keys and provides them to [redacted] via a Synamedia computer located at [redacted]

159. Serialization occurs near the end of the chip production process. [redacted] DIRECTV's satellite receivers and conditional access system can only use the chips having Synamedia's serialization keys.

160. On October 11, 2024, one of DIRECTV's satellite-receiver manufacturers informed DIRECTV that the expected delivery of more [redacted] chips for DIRECTV's commercial receivers (the COM51D) had been delayed indefinitely due to a lack of keys from Synamedia. This risked DIRECTV having no such commercial receivers by January 2025. The delay in deliveries of [redacted] chips was the result of a message from Synamedia to [redacted] threatening contractual liability if [redacted] continued to provide serialized chips destined for DIRECTV satellite receivers.

161. On September 19, 2024, Mr. Tzvi Gerstl, the Chief Technology Officer of Synamedia, notified [redacted] that DIRECTV is not a Synamedia customer or an "authorized user" under Synamedia's agreement with [redacted] Synamedia also stressed the importance and essential condition that Synamedia's





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

IP is supplied to authorized users only. Because of this notification from Synamedia, [redacted] stopped shipping chips to DIRECTV's OEM providers.

162. The October 2024 issue appeared to resolve when [redacted] used serialized keys it possessed from chip orders pre-dating July 31, 2024. However, the issue reappeared around November 4, 2024, when [redacted] rejected purchase orders for serialized chips booked by DIRECTV's equipment manufacturers after July 31, 2024, again due to Synamedia's threat to [redacted]

163. DIRECTV operates a near-just-in-time inventory system and carefully calibrates its satellite receiver inventory to meet demand. Synamedia's interference adversely impacted DIRECTV's ability to have satellite receivers manufactured and shipped. On information and belief, Synamedia's actions were designed to halt DIRECTV's supply chain for satellite receivers, thereby cutting off DIRECTV's ability to add new customers or replace equipment for existing customers. Synamedia's actions demonstrated Synamedia could, in fact, interfere directly and immediately in the ongoing operation of DIRECTV's business.

164. [redacted]. To avoid inventory issues, DIRECTV orders satellite receivers from its equipment manufacturers [redacted]

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

[redacted]

165. Due to Synamedia's interference into DIRECTV's supply chain, [redacted] has stopped fulfilling orders for serialized chips placed by DIRECTV's equipment manufacturers. [redacted]

166. [redacted]

167. The effects of Synamedia's supply-chain interference will [redacted].

168. Separately, Synamedia began interfering with DIRECTV's ability to activate new customers or activate new equipment for existing customers.

169. On the same day Synamedia sent its chip-production-halting message to [redacted] Synamedia also unexpectedly precluded DIRECTV from activating new satellite receivers, interfering with DIRECTV's customer relationships.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

170. [redacted]

171. On September 19, 2024, DIRECTV field installers were suddenly unable to activate new receivers during customer installations due to Synamedia withholding receiver IDs. Within one day, DIRECTV identified 14,860 missing receiver IDs. Synamedia's withholding of receiver IDs actively prevented DIRECTV from activating new customers, a service delay that adversely impacted DIRECTV's goodwill and business.

172. Although Synamedia eventually provided the missing receiver IDs, the timing of the event to coincide with Synamedia's notification to [redacted] demonstrated Synamedia's intent to disrupt DIRECTV's business on multiple fronts and its ability to instantly cause future service disruptions when it pleases, contrary to arguments in made to the Court to avoid being subject to an injunction.

173. Moreover, Synamedia's interference impacted DIRECTV's relationships with its customers by preventing them, even temporarily, from receiving programming. A lack of usable satellite receivers directly results in lost customers. Customers have a number of options for how they receive television programming and, once they subscribe with a different provider, it takes significant effort and money to induce them to return. If the reason for the failure of the relationship is DIRECTV's inability to provide satellite television service because of Synamedia's interference, customers will view DIRECTV less favorably and will be far less likely to return.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**COUNT 1**

**(Judicial Declaration that DIRECTV Has Not Waived Its Contractual Right to Declare a Transition)**

174. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

175. The Security Services Agreement does not provide for a waiver of DIRECTV's Transition rights unless DIRECTV expressly waives such rights in writing.

176. Synamedia has clearly expressed its position that DIRECTV has waived its rights to declare a valid Transition, but Synamedia has failed to identify any written document in which DIRECTV allegedly expressly waived such rights.

177. Synamedia has not—and cannot—identify any contractual language supporting Synamedia' position that DIRECTV could impliedly waive its Transition rights by not acting fast enough.

178. DIRECTV has never waived its right to declare a Transition under the Security Services Agreement.

179. There is a concrete dispute as to whether DIRECTV has waived its right to declare a Transition.

180. The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

181. DIRECTV is entitled to a declaratory judgment that there has been no waiver of its right to declare a Transition under the Security Services Agreement.

**COUNT 2**

**(Judicial Declaration that DIRECTV Validly Declared a Transition)**

182. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

183. The Security Services Agreement provides DIRECTV the right to declare a Transition "at its sole discretion" and "at any time" after March 1, 2007.

The Security Services Agreement provides that DIRECTV's "additional [Transition-related] rights and obligations shall apply" without any conditions precedent other than that such declaration be "written" and occur after March 1, 2007.

184. The Security Services Agreement does not provide any other time restriction as to when DIRECTV may declare a Transition.

185. The Security Services Agreement does not provide any other conditions under which a declaration of Transition might be valid or invalid. A declaration of Transition is either made, or it is not.

186. Synamedia has not—and cannot—identify any contractual language enabling it to invalidate a Transition.

187. On April 29, 2024, DIRECTV provided a written Declaration of Transition to Synamedia. The parties agreed to treat the date of the Declaration of Transition as April 30, 2024.

188. On May 6, 2024, Synamedia stated that DIRECTV's Declaration of Transition was invalid and untimely. The Security Services Agreement does not include any mechanism by which Synamedia may contest DIRECTV's Declaration of Transition.

189. DIRECTV's Declaration of Transition obligates Synamedia to cooperate with DIRECTV according to the contracted Transition procedures in Section 18 of the Security Services Agreement and entitles Synamedia to additional consideration.

190. There is a concrete dispute as to the sufficiency of DIRECTV's Declaration of Transition.

191. The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

192. DIRECTV is entitled to a declaratory judgment that its Declaration of Transition was valid in all respects.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## COUNT 3

**(Breach of Contract: Failure to Participate in Transition or Provide Additional Transition Services or other Conditional Access Services)**

193. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

194. Effective as of April 30, 2024, DIRECTV provided a valid and written Declaration of Transition to Synamedia under Section 18 of the Security Services Agreement.

195. On May 6, 2024, Synamedia stated that DIRECTV's Declaration of Transition was invalid and untimely.

196. DIRECTV has fulfilled all its obligations under the Security Services Agreement. DIRECTV remains willing and able to perform all of its Transition-related obligations under Section 18 of the Security Services Agreement.

197. More than 60 days have passed since DIRECTV declared a Transition. Synamedia has not provided the documents and information it was required to provide under the Transition procedure, including the "escrowed materials and all NDS Documentation regarding the Licensed Technology" required by Section 18.2.5. Accordingly, Synamedia has materially breached the Security Services Agreement.

198. Moreover, Synamedia failed to complete the technology transfer under Section 18.2.5 by June 29, 2024, as it was obligated to do, which constitutes a material breach of the Security Services Agreement.

199. Further still, Synamedia is in material breach of its obligations under Section 18.2.7 of the Security Services Agreement to provide a continued supply of CAMs and the necessary support services.

200. DIRECTV ordered the transfer of about [redacted] from Synamedia and, separately under Purchase Order No. 30766490, ordered about [redacted] from Synamedia.





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

201. DIRECTV placed Transfer Orders for about [redacted] to ship by August 12, 2024, [redacted] to ship by August 19, 2024, and [redacted] to ship by August 26, 2024, as well as Transfer Orders for another [redacted] to be shipped prior to October 9, 2024. DIRECTV requested Synamedia confirm it shipped or would ship DIRECTV's recycled CAMs in accordance with the Transfer Orders and fulfill Purchase Order No. 30766490.

202. Despite issuing an arbitrary deadline of October 9, 2024, Synamedia stated it would not comply with the Transfer Orders for DIRECTV's recycled cards. As such, to retrieve its cards before the Synamedia-mandated destruction deadline of October 9, 2024, DIRECTV ordered a truck and wrote to Synamedia on August 26, 2024, requesting to start physically collecting the cards at Synamedia's Costa Mesa facility on August 28, 2024. On August 27, 2024, Synamedia refused to allow DIRECTV to collect its cards and stated "Synamedia cannot accommodate that request." Instead, Synamedia threatened to destroy the DIRECTV CAMs in its possession. On September 4, 2024, DIRECTV was forced to physically collect approximately [redacted] new and recycled smart cards because Synamedia refused to comply with the Transfer Orders. DIRECTV subsequently received the remaining smart cards only after repeated requests to Synamedia.

203. Additionally, late in 2024, Synamedia shuttered its Costa Mesa, California facility, where a large amount of the work supporting DIRECTV's Conditional Access Segment was based. Section 5.1.3 of the Security Services Agreement (titled "Delivery of CAMs") provides the CAMs shall be delivered from Synamedia's facility in Lake Forest, California "or such other facility operated by [Synamedia] in the Territory as may be aggregable to DIRECTV ('CAM Delivery Points')," provides DIRECTV "the right to review and reasonably approve the security and storage procedures in place at the CAM Delivery Points," and requires Synamedia to "ship CAMs from the CAM Delivery Points to

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

locations as directed by DIRECTV." The Security Services Agreement defines "Territory" as "the United States of America (including its territories and possessions) and, if at any time DIRECTV is legally permitted to provide direct-to-home services in Canada, the United States and Canada (including their territories and possessions)." Section 18.2.7 requires, "[u]pon termination or expiration of this Agreement ***for any reason***," Synamedia to "provide such Conditional Access Services as requested by DIRECTV (including, if requested, a ***continued supply of CAMs*** and necessary support services including personalization/serialization, and including continued support for Security Technical Operations including ECMs) on a time and materials basis."

204. Synamedia's shut-down of its operations at and physical location in Costa Mesa without DIRECTV's consent constitutes a breach of the Security Services Agreement. Synamedia's failure to provide a continued supply of CAMs—and active interference in DIRECTV's satellite-receiver supply chain—constitutes a breach of the Security Services Agreement.

205. DIRECTV seeks specific performance.

206. DIRECTV's legal remedies are inadequate. Synamedia and DIRECTV have had a business relationship since the 1990s. Technology owned by Synamedia—including technology that was developed by DIRECTV, assigned to Synamedia, and licensed back to DIRECTV in perpetuity—has been ingrained in DIRECTV's Conditional Access Segment since at least 1994—the year DIRECTV made its first sale to a customer.

207. The Security Services Agreement is both reasonable and supported by adequate consideration. It provides for a mutuality of remedies. DIRECTV and Synamedia are parties to the Security Services Agreement.

208. The terms of the Security Services Agreement are clear and sufficiently definite to enable the Court to know what it is enforcing.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

209. The requested performance is the same performance promised by Synamedia in the Security Services Agreement.

210. By refusing to acknowledge the validity of DIRECTV's written Declaration of Transition, refusing to participate in the Transition process, and refusing to provide specific Additional Transition Services or other Conditional Access Services requested by DIRECTV, Synamedia has, in material breach of the Security Services Agreement: (a) denied DIRECTV its Transition License under Sections 18.2.1 and 9.1.2; (b) denied DIRECTV its right to access the contents of the Technology Escrow Account under Section 7.5; (c) denied DIRECTV's Source Code License under Section 18.2.3; (d) refused to transfer the requisite technology and information under Section 18.2.5 (including the escrow materials, regardless of whether they are in an escrow account); and (e) refused to provide Additional Transition Services or other Conditional Access Services, including the supply of conditional access modules, under Section 18.2.7.

211. Pursuant to Section 11.1 of the Security Services Agreement, DIRECTV notified Synamedia of its material breach by issuing a "Notice of Material Breach" to Synamedia on May 17, 2024.

212. Synamedia never cured its breach and remains in Breach.

213. As a result of Synamedia's failure to cure its Breach, DIRECTV terminated the Security Services Agreement on June 18, 2024, and formally notified Synamedia that DIRECTV terminated the Security Services Agreement.

214. DIRECTV followed the dispute resolution process prescribed in Section 13 of the Security Services Agreement before filing this counterclaim but was unable to resolve its disputes with Synamedia.

215. Synamedia has failed to participate in the Transition process as it was obligated to do, including by failing to provide DIRECTV with the materials listed in Section 18.2.5 and the services requested under Section 18.2.7.

216. Synamedia has thus materially breached the Security Services Agreement.

217. As a result of Synamedia's breaches, DIRECTV has been injured in its business or property and is entitled to damages.

218. As a result of Synamedia's refusal to acknowledge the validity of DIRECTV's written Declaration of Transition, refusal to participate in the Transition process, and refusal to provide specific Additional Transition Services or other Conditional Access Services requested by DIRECTV, DIRECTV has been forced to attempt to mitigate disruption to the Conditional Access Segment and its components and DIRECTV's service, including by expending time, money, and other resources to minimize the continued risk to and correct inefficiencies in DIRECTV's business caused by Synamedia's actions. For example, DIRECTV hired a former Synamedia architect who worked on DIRECTV's Conditional Access Segment, but DIRECTV has been unable to utilize the former Synamedia architect as planned due to Synamedia's multi-year delay of what should have otherwise been a smooth and harmonious Transition process.

**COUNT 4**

**(Judicial Declaration that DIRECTV Has a Perpetual Right and License to Synamedia's Intellectual Property Rights)**

219. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

220. The Security Services Agreement, including at Section 9.1.2, provides DIRECTV with a perpetual right and license to Synamedia's intellectual property, know-how, and documentation relating to DIRECTV's Conditional Access Segment.

221. DIRECTV's perpetual right and license enables its continued, full, and unrestricted enjoyment of its Conditional Access Segment both before and

after the Term and includes the right to use and make derivative works of any head end software and systems.

222. Synamedia has expressly disputed DIRECTV's perpetual right and license.

223. There is a concrete dispute as to the existence and scope of DIRECTV's perpetual right and license under the Security Services Agreement.

224. The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

225. DIRECTV is entitled to a declaratory judgment that DIRECTV has a perpetual right and license to enable its continued, full, and unrestricted enjoyment of its Conditional Access Segment after the Term of the Security Services Agreement.

**COUNT 5**

**(Breach of Contract: Failure to Acknowledge or Act Consistently with DIRECTV's Perpetual Right and License)**

226. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

227. The Security Services Agreement, including at Section 9.1.2, provides DIRECTV with a perpetual right and license to Synamedia's intellectual property, know-how, and documentation relating to DIRECTV's Conditional Access Segment.

228. DIRECTV's perpetual right and license enables its continued, full, and unrestricted enjoyment of its Conditional Access Segment both before and after the Term and includes the right to use and make derivative works of any head end software and systems.

229. Synamedia has expressly disputed DIRECTV's perpetual right and license. Synamedia has expressly stated its position that DIRECTV's rights cease

on expiration of the Security Services Agreement, and its actions mirror its position.

230. Synamedia has stated, unequivocally, that it will not perform its contractual duties or acknowledge or act consistently with DIRECTV's perpetual right and license.

231. DIRECTV seeks specific performance.

232. DIRECTV's legal remedies are inadequate. Synamedia and DIRECTV have had a business relationship since the 1990s. Technology owned by Synamedia—including technology that was developed by DIRECTV, assigned to Synamedia, and licensed back to DIRECTV in perpetuity—has been ingrained in DIRECTV's Conditional Access Segment since at least 1994—the year DIRECTV made its first sale to a customer.

233. The Security Services Agreement is both reasonable and supported by adequate consideration. It provides for a mutuality of remedies. DIRECTV and Synamedia are parties to the Security Services Agreement.

234. The terms of the Security Services Agreement are clear and sufficiently definite to enable the Court to know what it is enforcing.

235. The requested performance is the same performance promised by Synamedia in the Security Services Agreement.

236. By refusing to acknowledge DIRECTV's perpetual right and license, Synamedia has placed DIRECTV at risk of losing a critical element, its Conditional Access Segment, which DIRECTV has incorporated into its services for the last 30 years.

237. Pursuant to Section 11.1 of the Security Services Agreement, DIRECTV notified Synamedia of its material breach by issuing a "Notice of Material Breach" to Synamedia on May 17, 2024.

238. Synamedia never cured its breach and remains in Breach.

239. As a result of Synamedia's failure to cure its Breach, DIRECTV terminated the Security Services Agreement on June 18, 2024, and formally notified Synamedia that DIRECTV terminated the Security Services Agreement.

240. DIRECTV followed the dispute resolution process prescribed in Section 13 of the Security Services Agreement before filing this counterclaim but was unable to resolve its disputes with Synamedia.

241. Synamedia failed to provide DIRECTV with the technology, documents, and other materials covered by DIRECTV's perpetual right and license.

242. Synamedia has thus materially breached the Security Services Agreement.

243. As a result of Synamedia's breaches, DIRECTV has been injured in its business or property and is entitled to damages.

**COUNT 6**

**(Trade Secret Misappropriation by Synamedia)**

244. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

245. DIRECTV owns and possesses certain confidential and proprietary information that qualifies as a trade secret. Specifically, DIRECTV is the owner of Trade Secrets, including the technical information described herein that is necessary for operation of DIRECTV's Conditional Access Segment.

246. DIRECTV's Trade Secrets derive independent economic value from being not generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of DIRECTV's Trade Secrets.

247. Throughout the relationship between DIRECTV and Synamedia, Synamedia's project architect and development and support team have been based in California.

248. In order to provide services to DIRECTV, Synamedia has received DIRECTV's Trade Secrets.

249. In 2018, Synamedia began moving its development and support team to India, and the project architect shifted from California to Israel.

250. At some point in time, Synamedia established an Indian entity, Synamedia India Private Ltd.

251. On information and belief, employees of Synamedia India Private Ltd. provided development and support to DIRECTV on Synamedia's behalf.

252. Possession of DIRECTV's confidential, proprietary, trade-secret information—including DIRECTV's Trade Secrets—was necessary for Synamedia India Private Ltd. to provide development and support services to DIRECTV.

253. Software developers at Synamedia India Private Ltd. necessarily needed access to DIRECTV's Trade Secrets, as they needed to understand the functional purpose and behavior of the security, authorization, and interactivity systems they developed and supported.

254. DIRECTV has never provided written authorization for Synamedia to share DIRECTV's Trade Secrets with any other entity, including Synamedia India Private Ltd.

255. DIRECTV took reasonable measures to protect the secrecy of its Trade Secrets. Under Section 19 of the Security Services Agreement, DIRECTV had Synamedia's assurances that any "information relating to DIRECTV Technology" would be kept in "strict confidence" and not shared without prior written approval.

256. Upon information and belief, Synamedia disclosed DIRECTV's Trade Secrets, knowledge of which it acquired under the Security Services Agreement, to entities who are neither parties to nor authorized under the Security Services Agreement, including to Synamedia India Private Ltd.

257. The decision to provide DIRECTV's confidential and trade-secret information was a unilateral decision made by Synamedia.

258. At the time of the disclosure, Synamedia, as a party to the Security Services Agreement, knew or had reason to know the DIRECTV information it shared with its foreign affiliates, including Synamedia India Private Ltd., contained DIRECTV's Trade Secrets.

259. Synamedia's knowledge of DIRECTV's Trade Secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets, as Synamedia was contractually obligated to hold DIRECTV Technology in "strict confidence."

260. As a security vendor, Synamedia's unauthorized provision of components of DIRECTV's Conditional Access Segment, especially DIRECTV's Trade Secrets, presents a risk to DIRECTV, who is entitled to know who has access to its security software and data. The provision of the Trade Secrets, which were necessarily provided to Synamedia India Private Ltd. for it to provide software development and support services it provided over the last several years, constitutes trade secret misappropriation. The misappropriation places DIRECTV's security-related Trade Secrets at risk.

261. Synamedia's unilateral decision to provide DIRECTV's Trade Secrets to Synamedia India Private Ltd. denied DIRECTV the opportunity to vet who possesses its Trade Secrets or ensure that sufficiently secure protocols are in place to protect its Trade Secrets. The unauthorized sharing of this information with Synamedia India Private Ltd. presents actual, or at the very least threatened, harm to DIRECTV.

262. Synamedia's cross-border sharing of DIRECTV's Trade Secrets with employees of Synamedia India Private Ltd. constitutes misappropriation of DIRECTV's Trade Secrets.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**COUNT 7**

**(Judicial Declaration of No Trade Secret Misappropriation by DIRECTV)**

263. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

264. In 2004, DIRECTV and Synamedia entered into the Security Services Agreement whereby Synamedia provided technical support for DIRECTV's Conditional Access Segment.

265. The Security Services Agreement expressly allows for DIRECTV's use of conditional access systems and related components and technology provided by Synamedia.

266. DIRECTV's use and implementation of its Conditional Access Segment is expressly authorized by the Security Services Agreement.

267. The Security Services Agreement also provides DIRECTV with a perpetual right and license to all NDS and Synamedia technology that is implemented in DIRECTV's Conditional Access Segment.

268. The Security Services Agreement was terminated on June 18, 2024. DIRECTV retains rights to technical documents and information relating to its Conditional Access Segment, including under a perpetual right and license.

269. Synamedia's theories of inevitable disclosure rest on legal theories courts in this district and State reject and Synamedia otherwise fails to identify any trade secrets or articulate how DIRECTV may have misappropriated those trade secrets.

270. In addition, Synamedia is obligated to provide DIRECTV with a license to any trade secrets during the pendency of this litigation under Section 13.6 of the Security Services Agreement.

271. DIRECTV is entitled to a judicial declaration that DIRECTV has not misappropriated Synamedia's trade secrets.

**COUNT 8**

**(Breach of Contract: Breach of Confidentiality Provisions)**

272. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

273. Under Section 19.1 of the Security Services Agreement, Proprietary Information includes "information relating to DIRECTV Technology."

274. During the Term of the Security Services Agreement, DIRECTV disclosed its trade secrets, which constitute "information relating to DIRECTV Technology," to Synamedia.

275. Under Section 19.3.1 of the Security Services Agreement, Synamedia was required to keep all information relating to DIRECTV Technology, including DIRECTV's trade secrets, "in strict confidence."

276. Under Section 19.3.6 of the Security Services Agreement, Synamedia's obligations to keep all information relating to DIRECTV Technology, including DIRECTV's trade secrets, in strict confidence "continue in perpetuity."

277. As detailed in Count 6, upon information and belief, Synamedia provided a third party, Synamedia India Private Ltd., with DIRECTV's trade secrets without written authorization from DIRECTV.

278. Synamedia's provision of DIRECTV's trade secrets to Synamedia India Private Ltd. constitutes a breach of Synamedia's obligation to keep DIRECTV's Proprietary Information in strict confidence under Section 19.3.1 of the Security Services Agreement.

279. DIRECTV has complied with all confidentiality obligations owed to Synamedia.

280. The Security Services Agreement is both reasonable and supported by adequate consideration. It provides for a mutuality of remedies. DIRECTV and Synamedia are parties to the Security Services Agreement.

281. The terms of the Security Services Agreement are clear and sufficiently definite.

282. Synamedia has thus materially breached the Security Services Agreement.

283. As a result of Synamedia's breaches, DIRECTV has been injured in its business or property and is entitled to damages.

**COUNT 9**

**(Breach of Covenant of Good Faith and Fair Dealing)**

284. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

285. By operation of law, Synamedia is under an implied duty of good faith and fair dealing requiring Synamedia to deal and act fairly and in good faith with DIRECTV.

286. Synamedia's dealings prior to filing its lawsuit, later repeated in its Complaint, included specious positions and allegations. Synamedia's Complaint is unripe and suffers from other deficiencies but nonetheless levies unfounded and legally and factually implausible accusations against DIRECTV.

287. Synamedia's specious and deceptive positions, allegations, and arguments—many of which are contrary to and refuted by numerous express provisions of the Security Services Agreement as highlighted in Paragraphs 112 through 121—serve as the bases by which Synamedia (i) refuses to recognize or act consistently with DIRECTV's valid Declaration of Transition by refusing to participate in or otherwise provide Additional Transition Services or other Conditional Access Services and (ii) refuses to acknowledge or act consistently with DIRECTV's perpetual right and license. Under the Security Services Agreement, Synamedia was and remains obligated to perform the foregoing.

288. Synamedia's refusals and failures are unreasonable and constitute a tortious breach of the covenant of good faith and fair dealing.

289. Synamedia's refusals and failures were undertaken without proper legal and/or factual bases, are contrary to applicable legal principles—including those expressly provided for by the Security Services Agreement—and are therefore conduct that is oppressive, fraudulent, malicious, or, at a minimum, evidence a conscious disregard for DIRECTV's rights pursuant to Cal. Civ. Code § 3294. Synamedia should therefore be required to pay punitive damages for the purpose of deterring future unlawful conduct.

290. As a result of Synamedia's unreasonable conduct, DIRECTV has been injured in its business or property and is entitled to damages.

291. As a further result of Synamedia's unreasonable conduct, DIRECTV was compelled to and did retain legal counsel to enforce DIRECTV's rights, including under the Security Services Agreement. Synamedia is liable to DIRECTV for those attorneys' fees incurred by DIRECTV in order to enforce DIRECTV's rights as well as the value of DIRECTV's losses set forth above.

**COUNT 10**

**(Breach of Contract: Failure to Perform Through Resolution of Dispute-Resolution Process)**

292. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

293. As stated in Count 3, Synamedia has breached the Security Services Agreement by refusing to perform its obligations under the Transition procedure.

294. As stated in Count 5, Synamedia has breached the Security Services Agreement by refusing to acknowledge or act consistent with DIRECTV's perpetual right and license to the technology in DIRECTV's Conditional Access Segment.

295. Section 13 of the Security Services Agreement governs the resolution of disputes arising under the Security Services Agreement. It provides for a series of internal dispute-resolution steps (Section 13.2), the arbitration of most issues

(Section 13.3), and the litigation of issues relating to Intellectual Property Rights, violation of license rights, Transition, or Termination (Section 13.4).

296. Section 13.6 of the Security Services Agreement further states that "[i]n no event shall the application of the dispute resolution procedures set forth in this Article 13 serve to relieve either Party of its obligations under this Agreement, including those which are the subject of the resolution dispute, until such time as there is a final resolution of the dispute in accordance with this Article 13."

297. Because the parties' dispute over contract interpretation, DIRECTV's perpetual right and license, and Synamedia's Transition and post-Term obligations have not been finally resolved, Synamedia also materially breached its obligations under Section 13.6 of the Security Services Agreement by refusing to provide the required technology and documents, refusing to perform services, refusing to provide a license to Synamedia intellectual property, and bringing breach of contract, trade secret misappropriation, patent infringement, and copyright infringement claims against DIRECTV for its continued use of the conditional access system post-Term.

298. DIRECTV seeks specific performance.

299. DIRECTV's legal remedies are inadequate. Synamedia and DIRECTV have had a business relationship since the 1990s. Technology owned by Synamedia—including technology that was developed by DIRECTV, assigned to Synamedia, and licensed back to DIRECTV in perpetuity—has been ingrained in DIRECTV's Conditional Access Segment since at least 1994—the year DIRECTV made its first sale to a customer.

300. The Security Services Agreement is both reasonable and supported by adequate consideration. It provides for a mutuality of remedies. DIRECTV and Synamedia are parties to the Security Services Agreement.

301. The terms of the Security Services Agreement are clear and sufficiently definite to enable the Court to know what it is enforcing.

302. The requested performance is the same performance promised by Synamedia in the Security Services Agreement.

303. Synamedia has, in material breach of Section 13.6 of the Security Services Agreement: (a) denied DIRECTV its Transition License under Sections 18.2.1 and 9.1.2; (b) denied DIRECTV its right to access the contents of the Technology Escrow Account under Section 7.5; (c) denied DIRECTV's Source Code License under Section 18.2.3; (d) refused to transfer the requisite technology and information under Section 18.2.5 (including the escrow materials, regardless of whether they are in an escrow account); (e) refused to provide Additional Transition Services or other Conditional Access Services, including the supply of conditional access modules, under Section 18.2.7; (f) refused to acknowledge DIRECTV's perpetual right and license; (g) refused to provide DIRECTV with the materials covered by the perpetual right and license; and (h) acted in derogation of its disputed obligations by asserting claims based on DIRECTV's continued use of its conditional access system prior to a final resolution under Article 13 of the Security Services Agreement.

304. Synamedia has failed to participate in the Transition process as it was obligated to do, including by failing to provide DIRECTV with the materials listed in Section 18.2.5. Even though Synamedia disputes the validity of the Declaration of Transition, Synamedia was obligated under Section 13.6 of the Security Services Agreement to fully participate in the Transition process.

305. Synamedia has similarly failed to provide to DIRECTV the technology, documents, and other materials to which DIRECTV has a perpetual right and license. Even though Synamedia disputes the existence of DIRECTV's perpetual right and license, Synamedia was obligated under Section 13.6 of the Security Services Agreement to provide to DIRECTV the technology, documents, and other materials to which DIRECTV has a perpetual right and license, and

DIRECTV is entitled to continue use of said technology through at least the conclusion of the pending dispute.

306. Synamedia has thus materially breached the Security Services Agreement by violating Section 13.6.

307. As a result of Synamedia's breaches, DIRECTV has been injured in its business or property and is entitled to damages.

**COUNT 11**

**(Judicial Declaration that DIRECTV Has License and Use Rights to Middleware Software and Deliverables in Perpetuity)**

308. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

309. Effective January 31, 2011, NDS Limited (Synamedia's predecessor) and DIRECTV entered into a Middleware Development and License Agreement.

310. Under Section 6.3, DIRECTV has license and rights to use Middleware Software and Deliverables in perpetuity:

- Under Section 6.3(a)(i)(2), "to interface and operate other DIRECTV and third party software and products with the Middleware Software and Deliverables using the interfaces, for example the hardware drivers and other applications ("HDI" and/or "API') for the version of the Middleware Software and the common drivers and other applications interfaces ("CDI" and / or "API") for the Common Middleware Architecture ("CMA") version of the Middleware Software and any subsequent version thereto to be implemented in the DIRECTV Service; to interface and operate with the DIRECTV Product and the user interface/user experience ("UI"), and to utilize the application snippets, java libraries or java script to enable APIs and other functionality (such as iVG or UI) and interface and operate the EPG Engine with the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Middleware Software solely in DIRECTV Products and for use with the DIRECTV Service;"

- Under Section 6.3(a)(i)(3), "to make, have made, reproduce, use, import, export, sell, offer for sale, rent, lease, offer for lease, distribute, download, maintain, otherwise exploit and make derivative works from the source code and object code to the NDS developed portions of the UI provided to DIRECTV, including the ability to modify, improve, combine, disassemble, and otherwise create derivative works, solely in DIRECTV Products and for use with the DIRECTV Service;"
- Under Section 6.3(a)(i)(4), "to the extent the Middleware Software and Deliverables contains multiple components and/or modules which interact via interfaces, to substitute any such components and/or modules with other components and/or modules provided by DIRECTV (or other third parties) and integrate such DIRECTV or other third-party components and/or modules with the remaining Middleware Software and Deliverable modules using interfaces or other protocols for the CMA version of the Middleware Software and any subsequent version thereto, solely for use in DIRECTV Products and for use with the DIRECTV Service; provided, however, DIRECTV substitution of the security/conditional access components shall be restricted in accordance with the terms of the SSA between NDS and DIRECTV;"
- Under Section 6.3(a)(i)(5), "to make, have made, reproduce, make necessary copies, use, modify, combine, replace, maintain, and otherwise exploit in any manner the NDS Software components for headend systems in object code form only in connection with the operation of the DIRECTV Headend System(s) (including any additional or successor headend system(s)) used by DIRECTV or any third party working on behalf of DIRECTV solely for the DIRECTV Service, and to perform,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

display, execute, and otherwise use and exploit such NDS Software located at the Headend System(s) solely for the DIRECTV Service;" and

- Under Section 6.3(a)(i)(8), "to use, reproduce, modify, combine, replace, lend, distribute, otherwise exploit and make derivative works from the Documentation constituting API and CDI solely in connection with the DIRECTV Product and the DIRECTV Service."

311. Synamedia has clearly expressed its position that DIRECTV does not have the foregoing perpetual license and use rights and refuses to provide documentation and information consistent with the foregoing perpetual license and use rights.

312. There is a concrete dispute as to whether DIRECTV has the foregoing perpetual license and use rights.

313. The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

314. DIRECTV is entitled to a declaratory judgment that DIRECTV has the license and use rights enumerated in Sections 6.3(a)(i)(2)-(5) and (8) of the Middleware Development and License Agreement in perpetuity.

**COUNT 12**

**(Judicial Declaration that DIRECTV Validly and Timely Renewed the Middleware Development and License Agreement)**

315. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

316. Effective January 31, 2011, NDS Limited (Synamedia's predecessor) and DIRECTV entered into a Middleware Development and License Agreement.

317. Effective August 1, 2016, Cisco Systems, Inc. (NDS Limited's immediate successor and Synamedia's predecessor) and DIRECTV entered into an Umbrella Agreement, through which the parties amended provisions of several

contracts (including the Security Services Agreement and the Middleware Development and License Agreement) simultaneously.

318. On July 31, 2020, Synamedia and DIRECTV entered into a fourth amendment to the Umbrella Agreement. In a Section of the fourth amendment titled "DIRECTV Miscellaneous," the parties agreed that "DIRECTV shall have the option to renew for a four (4) year term or the option to renew for up to two (2) x two (2) year terms, under the same, pricing, terms and conditions of this Umbrella Agreement by providing notice to Synamedia sixty (60) days prior to the Expiration Date."

319. Effective May 30, 2024, DIRECTV exercised its exclusive right to extend the Middleware Development and License Agreement. DIRECTV's notice was timely, coming 60 days before the Expiration Date, and is valid, since DIRECTV had the exclusive option to renew, DIRECTV exercised its option, and Synamedia has no refusal right under the Middleware Development and License Agreement or the Umbrella Agreement.

320. Synamedia has clearly expressed its position that DIRECTV does not have the right to extend the Middleware Development and License Agreement in isolation, including in a letter dated June 26, 2024 and in its Third Amended Complaint.

321. There is a concrete dispute as to whether DIRECTV's exercise of its exclusive right to renew the Middleware Development and License Agreement was valid and timely.

322. The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

323. DIRECTV is entitled to a declaratory judgment that DIRECTV has validly and timely renewed the Middleware Development and License Agreement.

**COUNT 13**

**(Judicial Declaration that Synamedia Is in Breach of the Middleware Development and License Agreement)**

324. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

325. In Synamedia's Third Amended Complaint, Synamedia purported to state claims for relief based on DIRECTV's alleged continued use of intellectual property relating to DIRECTV's Conditional Access Segment as well as the middleware operating on its set-top boxes and satellite receivers. These claims for relief are barred by Section 14(b) of the Middleware Development and License Agreement, which expressly provides: "[Synamedia] covenants…neither [Synamedia] nor any of its subsidiaries shall assert against DIRECTV…***any claim of infringement of any patent***, mask work, ***trade secret***, ***copyright or other Intellectual Property Rights***[6] owned or controlled by [Synamedia] or [Synamedia]'s subsidiaries in ***any Deliverables or Intellectual Property Rights provided pursuant to this Agreement or any other deliverables or intellectual property provided pursuant to the SSA*** ('NDS IP'), which claims arises from or relates to…(b) ***continued use and support of any satellite television receiving equipment*** made prior to such termination of this Agreement (including continued use and support thereof after termination of this Agreement)."

326. Synamedia's attempt to state claims premised on DIRECTV's alleged infringement of certain intellectual property breach Section 14(b) of the Middleware Development and License Agreement, and DIRECTV is entitled to a judicial declaration to that effect.

327. Separately, effective August 1, 2016, Cisco Systems, Inc. (NDS Limited's immediate successor and Synamedia's predecessor) and DIRECTV

[6] The Middleware Development and License Agreement defines "Intellectual Property Rights" to include "all inventions," "all copyrights," "all registered trade secrets," and "any other similar rights or intangible asserts."





BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

entered into an Umbrella Agreement, through which the parties amended provisions of several contracts (including the Security Services Agreement and the Middleware Development and License Agreement) simultaneously.

328. On July 31, 2020, Synamedia and DIRECTV entered into a fourth amendment to the Umbrella Agreement. In a Section of the fourth amendment titled "DIRECTV Miscellaneous," the parties agreed that "DIRECTV shall have the option to renew for a four (4) year term or the option to renew for up to two (2) x two (2) year terms, under the same, pricing, terms and conditions of this Umbrella Agreement by providing notice to Synamedia sixty (60) days prior to the Expiration Date."

329. Effective May 30, 2024, DIRECTV timely exercised its exclusive right to extend the Middleware Development and License Agreement.

330. Synamedia has clearly expressed its position that DIRECTV does not have the right to extend the Middleware Development and License Agreement in isolation, including in a letter dated June 26, 2024 and in its Third Amended Complaint.

331. The Middleware Development and License Agreement remains in force because DIRECTV exercised its exclusive right to renew it.

332. DIRECTV has fulfilled all its obligations under the Middleware Development and License Agreement and remains willing and able to perform all its obligations under the same.

333. Synamedia's refusal to acknowledge the validity of DIRECTV's renewal of the Middleware Development and License Agreement has led Synamedia to cease all performance under the same, placing Synamedia in breach of the Middleware Development and License Agreement.

334. There is a concrete dispute as to whether Synamedia must continue performing its obligations under the Middleware Development and License Agreement during the renewal term. There is also a concrete dispute as to whether

Synamedia's claims for relief premised on DIRECTV's alleged infringement of certain intellectual property are barred by Section 14(b) of the Middleware Development and License Agreement.

335. These disputes are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

336. DIRECTV is entitled to a declaratory judgment that Synamedia is in breach of the Middleware Development and License Agreement and must perform its obligations under the same during the renewal term.

**COUNT 14**

**(Judicial Declaration Synamedia Cannot Maintain a Claim of Copyright Infringement Against DIRECTV)**

337. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

338. Synamedia accused DIRECTV of infringing a copyright having Registration Number TX0005640023, which was registered on February 11, 2003.

339. The Public Catalog of the U.S. Copyright Office indicates that Registration Number TX0005640023 covers a work titled "NDS Verifier" or "NDS Verifier DirecTV PO4."

340. The Verifier is a software module resident in an IRD allowing CAMs and IRD Chips to interface with IRD software and data being processed by the IRD. An IRD is an integrated receiver/decoder circuitry, and a CAM is inserted into an IRD.

341. Under Section 8.7 of the Security Services Agreement, compensation to Synamedia through its sale of CAMs to DIRECTV encompassed fees for any rights to Verifier software residing on any IRD manufactured or sold after the Effective Date of the Security Services Agreement.

342. Under the first sale doctrine, 17 U.S.C. § 109, and case law interpreting the same, copies of the Verifier included on an IRD while the Security

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Services Agreement was in force are not subject to a claim of copyright infringement, as the copies of the Verifier were lawfully made.

343. Synamedia has nonetheless filed a claim of copyright infringement against DIRECTV for use of Verifier copies that were lawfully made.

344. There is a concrete dispute as to whether Synamedia can bring a claim of copyright infringement for DIRECTV's sale or use of IRDs including such copies of the Verifier.

345. The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

346. DIRECTV is entitled to a declaratory judgment that Synamedia has no right to assert a claim of copyright infringement against DIRECTV accusing IRDs including a copy of the Verifier made while the Security Services Agreement was in force.

Baker & Hostetler LLP
Attorneys at Law
Los Angeles

**COUNT 15 (Tortious Interference with Economic Relations)**

347. DIRECTV realleges and incorporates by reference the foregoing paragraphs.

348. [redacted] manufactures the chips that become serialized into the CAMs used in DIRECTV's Conditional Access Segment.

349. DIRECTV contracts with [redacted] for the provision of serialized chips used in satellite receivers and with equipment manufacturers to manufacture set-top boxes and satellite receivers that are provided to customers to access and decrypt DIRECTV's satellite signal. The equipment manufacturers order CAMs from [redacted] which they integrate into the set-top boxes and satellite receivers.

350. When [redacted] receives an order for chips from DIRECTV's satellite receiver equipment manufacturers, [redacted] places an order with its silicon fabricator for the semiconductor silicon. After receiving an order from [redacted] the fabricator manufactures the silicon, cuts the silicon into chip-sized

pieces, and installs electronics and pins to create chips. Synamedia's serialization technology is then imparted to the chips to create the CAMs incorporated into the set-top boxes and receivers.

351. [redacted].

352. On October 11, 2024, one of DIRECTV's satellite-receiver manufacturers informed DIRECTV that the expected delivery of more [redacted] chips for DIRECTV's commercial receivers (the COM51D) had been delayed indefinitely due to a lack of keys from Synamedia. This risked DIRECTV having no such commercial receivers by January 2025. The delay in deliveries of [redacted] chips was the result of a message from Synamedia to [redacted] threatening contractual liability of [redacted] continued to provide serialized chips destined for DIRECTV satellite receivers.

353. On September 19, 2024, Mr. Tzvi Gerstl, the Chief Technology Officer of Synamedia, notified [redacted] that DIRECTV "is no longer a Synamedia customer nor an authorised user" under Synamedia's agreement with [redacted] Synamedia also stressed the "paramount importance and essential condition" that Synamedia's IP "is supplied to authorised users only." Dkt. 160-5. Because of this notification from Synamedia, [redacted] stopped shipping chips to DIRECTV's equipment manufacturers. By November 4, 2024, it became clear that Synamedia's threat to [redacted] resulted in [redacted] rejecting any purchase orders for serialized chips destined for DIRECTV satellite receivers.

354. DIRECTV operates a near-just-in-time inventory system and carefully calibrates its satellite receiver inventory to meet demand. Synamedia's interference adversely impacted DIRECTV's ability to have satellite receivers manufactured and shipped. On information and belief, Synamedia's actions were designed to halt DIRECTV's supply chain for satellite receivers, thereby cutting off DIRECTV's ability to add new customers or replace equipment for existing customers.

Synamedia's actions demonstrated Synamedia could, in fact, interfere directly and immediately in the ongoing operation of DIRECTV's business.

355. Due to Synamedia's interference into DIRECTV's supply chain, [redacted] has stopped fulfilling orders for serialized chips placed by DIRECTV's equipment manufacturers. [redacted]

356. [redacted] is a key supplier in DIRECTV's supply chain for satellite receivers and set-top boxes. DIRECTV and [redacted] thus have an economic relationship by [redacted] role in DIRECTV's supply chain that provides economic benefits to DIRECTV.

357. Synamedia knew of the economic relationship between [redacted] and DIRECTV.

358. Synamedia's actions in withholding serialization keys from [redacted] were meant to disrupt the economic relationship between [redacted] and DIRECTV. Moreover, Synamedia's overt act of conveying to [redacted] in writing Synamedia's position that DIRECTV was "no longer a Synamedia customer nor an authorised user" of Synamedia IP and stressing the "paramount importance and essential condition" that Synamedia's IP "is supplied to authorised users only" was designed to threaten [redacted] with legal liability if [redacted] provided serialized chips to DIRECTV's equipment manufacturers. Synamedia's correspondence to [redacted] was an intentional, overt act designed to disrupt the economic relationship between DIRECTV and [redacted] thereby further disrupting the economic relationship between DIRECTV and satellite-receiver manufacturers and, eventually, DIRECTV's relationships with its customers.

359. Synamedia's statement to [redacted] that DIRECTV is "no longer a Synamedia customer nor an authorised user" of Synamedia IP is objectively baseless.

360. Synamedia knew or reasonably should have known at the time it contacted [redacted] that its statement that DIRECTV is "no longer a Synamedia customer nor an authorised user" of Synamedia IP was objectively baseless.

361. Synamedia knew or reasonably should have known at the time it contacted [redacted] that [redacted] refusal to manufacture serialized chips would impact the ability of DIRECTV's equipment manufacturers to supply equipment to DIRECTV and, ultimately, DIRECTV's relationships with its customers.

362. Synamedia's interference in the economic relationships between DIRECTV and [redacted] and DIRECTV and satellite-receiver manufacturers has disrupted DIRECTV's inventory. DIRECTV is damaged because it is forced to mitigate its inventory disruptions.

363. Unless the economic relationships between DIRECTV and [redacted] and DIRECTV and satellite-receiver manufacturers are fully restored, DIRECTV will deplete its inventory of commercial satellite receivers and be unable to provide service to new commercial customers or provide new equipment to existing commercial customers, which will cause significant damages to DIRECTV and irreparably harm in severely damaged customer relationships.

364. As a result of Synamedia's interference with DIRECTV's supply chain and customer relationships, DIRECTV has been forced to attempt to mitigate the effect of Synamedia's actions designed to hinder and harm DIRECTV's business, including by expending time, money, and other resources to move serialized chips between satellite-receiver manufacturers.

365. DIRECTV seeks actual damages, punitive damages from Synamedia's intentional bad acts, a prohibitive injunction prohibiting Synamedia from interfering with DIRECTV's supply chain, and a mandatory injunction ordering Synamedia to confirm with [redacted] and DIRECTV's equipment manufacturers

Case 2:24-cv-04967-GW-MAA Document 265 Filed 07/08/25 Page 101 of 105 Page ID #:5831

that serialized chips may be manufactured and incorporated into set-top boxes and satellite receivers destined to DIRECTV or its customers.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Case 2:24-cv-04967-GW-MAA Document 262 Filed 07/10/25 Page 101 of 105 Page ID #:5331

## PRAYER FOR RELIEF

WHEREFORE, DIRECTV prays for relief as follows:

A. An injunction requiring Synamedia to immediately and fully participate in the Transition process under the Security Services Agreement;

B. An injunction requiring Synamedia to provide DIRECTV with all NDS Documentation and other documents and information in the Technology Escrow Account and listed in Section 18.2.5 of the Security Services Agreement;

C. An order requiring Synamedia's specific performance of all obligations under the Security Services Agreement and the Middleware Development and License Agreement;

D. An order requiring Synamedia's immediate performance of its Transition obligations and provision of all materials to which DIRECTV has a perpetual right and license until it receives a final judgment holding otherwise, in accordance with Section 13.6 of the Security Services Agreement;

E. A declaration that DIRECTV has not waived its right to initiate a Transition under the Security Services Agreement between DIRECTV and Synamedia;

F. A declaration that DIRECTV validly declared a Transition under the Security Services Agreement between DIRECTV and Synamedia;

G. A declaration that DIRECTV has a perpetual right and license to Synamedia's Intellectual Property Rights after the end of the Term of the Security Services Agreement between DIRECTV and Synamedia;

H. A declaration that DIRECTV has not misappropriated any trade secret of Synamedia;

I. A declaration that DIRECTV has the license and use rights to Middleware Software and Deliverables specified in Sections 6.3(a)(i)(2)-(5) and (8) of the Middleware Development and License Agreement in perpetuity;

J. A declaration that DIRECTV has validly and timely renewed the Middleware Development and License Agreement;

K. A declaration that Synamedia is in breach of the Middleware Development and License Agreement;

L. A declaration that Synamedia has no right to assert a claim of copyright infringement against DIRECTV accusing IRDs including a copy of the Verifier authorized under the Security Services Agreement;

M. An award of actual and punitive damages in an amount to be proven at trial from Synamedia's tortious interference with economic relationships;

N. A prohibitive injunction prohibiting Synamedia from interfering with DIRECTV's supply chain;

O. A mandatory injunction ordering Synamedia to confirm with [redacted] and DIRECTV's equipment manufacturers that serialized chips may be manufactured and incorporated into set-top boxes and satellite receivers destined to DIRECTV or its customers;

P. An award of damages in an amount to be proved at trial attributable to Synamedia's breaches of confidentiality and other provisions of the Security Services Agreement;

Q. An award of damages in an amount to be proved at trial attributable to Synamedia's tortious interference with DIRECTV's economic relationships;



BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Case 2:24-cv-04967-GW-MAA Document 262 Filed 07/21/25 Page 104 of 105 Page ID #:74801

R. Exemplary damages by doubling the damages attributable to Synamedia's willful and malicious misappropriation of DIRECTV's trade secrets;

S. An award of DIRECTV's reasonable attorneys' fees for Synamedia's willful and malicious misappropriation of DIRECTV's trade secrets;

T. An award of DIRECTV's reasonable attorneys' fees and costs under Section 13.4 of the Security Services Agreement between DIRECTV and Synamedia;

U. An award of punitive damages for Synamedia's oppressive, fraudulent, or malicious breach of the covenant of good faith and fair dealing; and

V. An award of punitive damages for Synamedia's oppressive, fraudulent, or malicious tortious interference with DIRECTV's economic relationships;

W. An award of such other relief the Court deems just and proper.

Dated: July 21, 2025

Respectfully submitted,

BAKER & HOSTETLER LLP

By: */s/ DRAFT*
Christina J. Moser (S.B.N. 199027)

Attorney for Defendant and Counterclaimant *DIRECTV, LLC*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Case 2:24-cv-04967-GW-MAA Document 262 Filed 07/21/25 Page 105 of 105 Page ID #:4817

## PROOF OF SERVICE

***Synamedia Americas LLC v. DIRECTV, LLC***
**Case No. 2:24-cv-04967-GW-KSx**

I, Christina J. Moser, declare:

I am employed in Los Angeles, CA. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 1900 Avenue of the Stars, Suite 2700, Los Angeles, CA 90067-4301. On July 21, 2025, I served a copy of the within document(s):

**DIRECTV, LLC'S ANSWER AND AFFIRMATIVE DEFENSES TO THIRD AMENDED COMPLAINT, AND COUNTERCLAIMS**

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☐ by placing the document(s) listed above in a sealed envelope and affixing a pre-paid air bill and causing the envelope to be delivered to a FEDERAL EXPRESS agent for delivery.

☑ by transmitting via electronic mail the document(s) listed above to the e-mail address(es) set forth below on this date.

Julie A. Shepard
*jshepard@jenner.com*
Andrew Gregory Sullivan
*agsullivan@jenner.com*
Madeline Paige Skitzki
*mskitzki@jenner.com*
Kristen Green
*kgreen@jenner.com*
**Jenner and Block LLP**
515 South Flower Street, Suite 3300
Los Angeles, CA 90071
***Attorneys for Plaintiff Synamedia Americas LLC***

I declare under penalty of perjury under the laws of the State of California the above is true and correct.

Executed on July 21, 2025, at Cleveland, Ohio.

*/s/ DRAFT*
Christina J. Moser

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Case 2:24-cv-04967-GW-MAA Document 271-1 Filed 07/21/25 Page 106 of 107 Page ID #:3178

# Exhibit A

Redacted

Case 2:24-cv-04967-GW-MAA Document 262 Filed 07/08/25 Page 1 of 1 Page ID #:7543

# Exhibit B

Redacted